**MULTISTATE LEGAL STUDIES, INC., a Delaware corporation, Plaintiff/Counter–Defendant/Appellant,**

v.

**HARCOURT BRACE JOVANOVICH LEGAL AND PROFESSIONAL PUBLICATIONS, INC.; Colorado Professional Education, Inc., doing business as Colorado Bar Refresher, Inc., Defendants/Counter–Claimants/Appellees.**

No. 94–1148.

United States Court of Appeals, Tenth Circuit.

Aug. 29, 1995.

James M. Harris of Sidley & Austin, Los Angeles, CA (Robert Fabrikant of Sidley & Austin, Los Angeles, CA; Julia E. Sullivan of Sidley & Austin, Washington, DC; and Richard A. Feinstein of McKenna & Cuneo, Washington, DC, with him on the briefs), for appellant.

Tucker K. Trautman of Ireland, Stapleton, Pryor & Pascoe, Denver, CO (Hardin Holmes of Ireland, Stapleton, Pryor & Pascoe, Denver, CO; Stephen M. Axinn and John D. Harkrider of Skadden, Arps, Slate, Meagher & Flom, New York City; and Edward P. Timmins of Otten, Johnson, Robinson, Neff & Ragonetti, Denver, CO, with him on the briefs), for appellees.

Before ANDERSON and McWILLIAMS, Circuit Judges, and BROWN,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

## I. INTRODUCTION

The plaintiff in this antitrust action is Multistate Legal Studies, Inc. ("PMBR"), a commercial provider of bar examination preparation to would-be lawyers in Colorado and elsewhere. PMBR claims that anticompetitive actions by two other providers of bar review courses, defendants Harcourt Brace Jovanovich Legal and Professional Publications, Inc. ("HBJL") and its Colorado licensee, Colorado Professional Education, Inc. d/b/a Colorado Bar Refresher, Inc. ("CBR"), were the reason PMBR's Colorado market share dropped from 84 percent in 1991 to 23 percent in 1993.

PMBR accuses HBJL and CBR of the following antitrust law violations: engaging in an illegal tying arrangement and conspiring to fix predatory prices, in violation of section 1 of the Sherman Act; attempting and conspiring to monopolize the supplemental bar workshop market and monopolizing and conspiring to monopolize the full-service bar review course market, in violation of section 2 of the Sherman Act. PMBR appeals the district court's grant of summary judgment against it on all claims.[1]

We hold that PMBR has shown a genuine issue of material fact with respect to the Sherman Act section 1 tying and predatory pricing claims, and the Sherman Act section 2 claims of attempt and conspiracy to monopolize the supplemental course market, but not with respect to the claims of monopolization of and conspiracy to monopolize the full-service course market.

PMBR also appeals the district court's order overruling PMBR's objections to a magistrate judge's order concerning confidential record information. Because we are remanding the case for trial of other issues, the court's order on this issue becomes interlocutory, and we decline to review it at this time.

## II. BACKGROUND

### A. BAR EXAM PREPARATION

The Colorado bar exam consists of four components: the Multistate Bar Exam

---

The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

1. The complaint also contained a tying claim under section 3 of the Clayton Act, which was dismissed as well; because PMBR does not pursue it in its opening brief, we deem it waived. *State Farm Fire & Casualty Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994) (citing *Headrick v. Rockwell Int'l Corp.,* 24 F.3d 1272, 1277–78 (10th Cir.1994)).

("MBE"), the Multistate Professional Responsibility Exam ("MPRE"), essay questions, and a law practice simulation problem known as a "performance test."

Two types of bar review courses are relevant to this litigation: "full-service" courses, designed to prepare students for all components of a jurisdiction's bar examination, and "supplemental multistate workshops," which prepare students for only the MBE portion of a jurisdiction's bar exam.

At the heart of this case is the 1992 decision by HBJL and CBR, who previously had offered their full-service course and their supplemental MBE course separately, to offer the full-service course only in a package with the supplemental workshop. HBJL is the country's largest provider of full-service bar review courses. Its exclusive Colorado licensee, CBR, is entitled to use HBJL's "BAR/BRI" course trade name, course materials and national lecturers. HBJL and CBR have stipulated for summary judgment purposes that they exercise monopoly power over the Colorado full-service course market; PMBR's evidence puts their market share at more than 80 percent. *See* Plaintiff–Appellant's App. at 191 (Summ. of Attach. to Pl.'s Mem. in Opp'n to Defs.' Mot.Summ.J. [hereinafter "Summary"] ). Their only full-service competitor in Colorado is a company called SMH Bar Review.

The evidence indicates both sides have viewed PMBR as a potential competitor in the Colorado full-service course market. It invested three years and $1 million in an effort to enter the California full-service market, but ultimately abandoned that effort. In conjunction with a company called BRG, PMBR offers a full-service course in Georgia, Alabama, and Tennessee, and has expressed its plans to expand throughout the Southeast. PMBR claims that its plan to expand its full-service course from California to other states, including Colorado, has been stymied by the losses caused by the Defendants' alleged predatory acts. *Id.* at 360–61 (Feinberg Aff. ¶ 30).

PMBR is the largest provider of supplemental MBE workshops nationally, and in Colorado it currently offers only supplemental MBE workshops. PMBR controlled 84 percent of the Colorado supplemental MBE market in 1991 but claims to have dropped to 23 percent by 1993. As discussed infra, HBJL and CBR contest these figures, but we accept them as true for summary judgment purposes. *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992).

In addition to the full-service BAR/BRI course, HBJL and CBR also offer a supplemental MBE workshop that competes with PMBR's workshop. The Defendants' course was previously called the HBJ Multistate Workshop; now it is called "Gilbert." In 1991, the Defendants had 11 percent of the Colorado workshop market, but by 1993 their share had risen to 76 percent. Other actual or potential competitors in that market include a company called APTS, with 1 percent of the market in 1993; Reed Law Group, which planned a 1993 workshop but cancelled it; and SMH Bar Review, which historically has bundled its MBE training into its full-service course but also offered a separate workshop in 1991.

## B. *ANTICOMPETITIVE ACTS*

PMBR claims that HBJL and CBR engaged in various anticompetitive acts directly targeted at PMBR in the supplemental MBE market. PMBR also claims that HBJL and CBR illegally acquired their monopoly power in the full-service market through a secret market allocation agreement, and their monopoly power made it possible for their acts in the MBE workshop market to harm PMBR.

### 1. *Acts Allegedly Directed at PMBR*

PMBR claims that starting in 1992, HBJL and CBR began bundling together their supplemental MBE workshop, Gilbert, with their full-service BAR/BRI course and pricing the bundled Gilbert workshop below cost. PMBR also presents evidence of a substantial increase nationwide in the number of scheduling conflicts between the BAR/BRI course and the PMBR workshop starting in 1991. PMBR identifies three specific conflicts in Colorado, in the summer 1991, winter

1991, and summer 1992 courses. And PMBR complains that HBJL and CBR advertised falsely that the BAR/BRI course would include the Gilbert workshop "for free" when actually, in 1993, Defendants raised the BAR/BRI course price by $50.

PMBR contends that these acts had a twofold purpose: to achieve a monopoly in the supplemental MBE workshop market, and thereby to so weaken PMBR that it would be forced to abandon its efforts as a full-service competitor. PMBR alleges that the Defendants adopted this strategy after a prior attempt to avoid competition had failed. PMBR's president, Robert Feinberg, stated that in 1989, HBJL's chief executive officer, Richard Conviser, proposed an illegal market allocation agreement whereby HBJL would abandon the supplemental MBE workshop market nationwide if PMBR would refrain from pursuing future entry into the full-service market outside California. *See* Plaintiff–Appellant's App. at 193–94 (Summary); *id.* at 359 (Feinberg Aff. ¶ 23). Mr. Feinberg said that when he refused, Mr. Conviser threatened to make him "sorry," and the bundling, predatory pricing, increase in scheduling conflicts, and false advertising then ensued.

### 2. *Defendants' Acquisition of Monopoly Power*

PMBR also argues that when HBJL and CBR, or their predecessors, signed their first licensing agreement, they secretly entered into an illegal agreement dividing up the Colorado, Wyoming, and other markets between them, and they have secretly renewed their noncompetition pact ever since. The companies were competitors in the Colorado full-service market before signing their first license agreement in 1974. Since then, although their original written agreement and subsequent written extensions have not prohibited competition, the two companies have not competed against each other. HBJL and CBR deny any secret agreement and say it simply would make no sense to compete and undermine the BAR/BRI trademark. The companies' latest written agreement, signed in 1989, was to expire in 1991 but remains in effect by oral extension.

To support its allegation that a secret agreement existed, PMBR offers evidence that HBJL officials previously proposed market allocation agreements to two other competitors, *id.* at 195–96 (Summary), as well as to PMBR itself, and that in one state HBJL entered an explicit market allocation agreement that was declared illegal per se by the Supreme Court. *See Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 402–03, 112 L.Ed.2d 349 (1990) (per curiam). PMBR also points to evidence that CBR's founder, Jerry Kopel, once threatened to offer competing bar review courses outside Colorado if HBJL did not give him more favorable license terms, but he ultimately did not carry out his threat.

### III.  DISCUSSION

We review the grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). Because PMBR is the nonmoving party, its evidence is to be believed; all justifiable inferences are to be drawn in its favor; its nonconclusory version of any disputed issue of fact is assumed to be correct. *See Kodak,* 504 U.S. at 456, 112 S.Ct. at 2076.

### A.  *ANTITRUST CLAIMS*

PMBR claims violations of both section 1 and section 2 of the Sherman Act. Section 1 of the Act focuses on the anticompetitive behavior of joint actors, prohibiting "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 2 applies to unilateral as well as joint action, making it illegal for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of ... trade or commerce." 15 U.S.C. § 2.

### 1.  *Section 1 Tying Arrangement Claim*

PMBR claims that HBJL and CBR created an unlawful tying arrangement in violation of Sherman Act section 1, by bundling the Gilbert workshop together with the BAR/

BRI course and requiring customers to purchase Gilbert if they wanted BAR/BRI. The Defendants reply that all they did was to improve the curriculum of their full-service BAR/BRI course, a procompetitive act.

Since Colorado began requiring the MBE as part of its bar exam, the Defendants' full-service BAR/BRI course has included some level of MBE preparation. Since the 1970s, BAR/BRI's MBE component has included an in-class practice MBE exam with written answers that could be reviewed at home. In 1989, the label "HarBrace" was attached to this test and associated lectures and practice drills. The separately sold MBE workshop, now known as Gilbert, has consisted of another exam with written answers, plus two days of in-class answer review.

Starting in the 1980s, PMBR and the Defendants' full-service competitor, SMH, began pointing to the Defendants' dual course offerings in their advertising and saying that by selling a separate MBE workshop, the Defendants were admitting that BAR/BRI's internal MBE component was inadequate. At the same time that the ads denigrating the full-service course were appearing, enrollment in Gilbert (or the Defendants' supplemental MBE workshop under a previous name) was dropping precipitously, from 78 people in the winter 1986 course and 238 in the summer 1986 course to a single student in the winter of 1992.

The Defendants added one day of in-class review of the practice MBE exam to their BAR/BRI course in their winter 1992 session, then added a second day of review in the summer 1992 course, so that the full-service course contained the same three-day workshop format as the separate Gilbert course. They then advertised that students signing up for BAR/BRI would receive Gilbert "for free" or "at no extra charge." [2] The first time they offered the package, in summer 1992, they did not raise the $795 BAR/BRI course tuition. The next winter, however, they raised it by $50, partly to cover some of the Gilbert costs. Customers could still buy Gilbert separately for $325, but they could not get any discount from the

package price if they wanted BAR/BRI without Gilbert. This change was made in Colorado and in some, but not all, other states where HBJL operated.

PMBR offers evidence that the bundling of Gilbert was intended as a temporary move only. In a September 11, 1992, letter written by CBR's president, Stephen P. Davis, to an HBJL official, Mike Connors, Mr. Davis referred to a future time when the Gilbert course would again be offered only for added tuition, as it was before the summer of 1992. Plaintiff–Appellant's App. at 199 (Summary); *id.* at 346 (Baseman Aff.Ex. 6). PMBR also offers evidence that the administration of the BAR/BRI course and the administration of the Gilbert course have never been combined; the courses have separate national administrators, campus representatives, registration forms and addresses, suggesting that administrative streamlining was not the reason for the bundling.

■ A tying arrangement is an agreement by a party to sell one product—the "tying product"—only on condition that the buyer also purchase a second product—the "tied product"—or at least agree not to buy that product from another supplier. *Kodak,* 504 U.S. at 461–62, 112 S.Ct. at 2079–80 (citing *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958)). A tie-in constitutes a per se section 1 violation if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied product market. *Id.* 504 U.S. at 462, 112 S.Ct. at 2079–80.

■ The elements, then, of a per se violation, are (1) two separate products, (2) a tie—or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market. Here, the parties stipulate to the third requirement, that HBJL and CBR have monopoly power in the full-service course market, and the Defendants have not raised the issue of

---

**2.** The practice exam within the BAR/BRI course and the practice exam in the separate Gilbert workshop had previously covered the same ground but with different exam questions.

the fourth requirement, the volume of commerce affected. We examine, therefore, only the two-product and conditioning requirements.

### a. *The Two–Product Requirement*

■ HBJL and CBR have stipulated that full-service courses and supplemental MBE workshops are in separate product markets for antitrust law purposes. They do not concede, however, that the existence of separate markets means separate products were involved here. They argue that their actions involved nothing more than the improvement of a single product—their full-service course.

PMBR argues on appeal that the district court failed to apply the proper test to determine whether two products exist. We agree. The court focused on PMBR's stipulation that the purpose of a full-service course includes preparing bar applicants for the MBE as well as for the other parts of the bar exam. From this, the court appears to have concluded that any effort to improve the full-service course by adding elements to it could not possibly constitute the bundling of a second product, at least where those added elements related to the MBE. In this the court erred.[3]

The Supreme Court has made clear that the test for determining whether two components are separate products turns not on their function, but on the nature of any consumer demand for them.[4] For two items at issue to be considered distinct products, "there must be sufficient consumer demand so that it is efficient for a firm to provide [one] separate from [the other]." *Kodak*, 504 U.S. at 462, 112 S.Ct. at 2080; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21–22, 104 S.Ct. 1551, 1562–63, 80 L.Ed.2d 2 (1984). *See also Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 684–85 (4th Cir.1992) (district court erred in reasoning that since customers' only legitimate purpose for using defendant's diagnostic software was to repair computers, defendant was providing

only a single integrated product of computer servicing, rather than a package of service and diagnostic software).

The Defendants argue that a different analysis is required in this case because it involves "overlap markets." They define "overlap markets" as a multicomponent package being sold in one market and one of those components being sold in a second market, and they contend that in such situations, courts have universally held that the package was a single product. We disagree that courts universally have so held. *See, e.g., Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 (7th Cir.1987); *Mozart Co. v. Mercedes–Benz of N. Am., Inc.*, 593 F.Supp. 1506, 1515 (N.D.Cal.1984), *aff'd*, 833 F.2d 1342 (9th Cir.1987), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988); *Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft*, No. N–79–2066, 1982 WL 1870, at *6–9 (D.Md. June 4, 1982), *reinstated*, No. Civ. A.N. 79–2066, 1984 WL 1105 (D.Md. June 11, 1984). Moreover, we are not persuaded either that the "overlap markets" characterization does anything more than restate the problem, or that, if it does, the Supreme Court's *Kodak/Jefferson Parish* test is somehow less controlling in such cases than in any others.

PMBR maintains that by incorporating BAR/BRI and Gilbert into a package, the Defendants have "link[ed] two distinct markets for products that were distinguishable in the eyes of buyers." *Jefferson Parish*, 466 U.S. at 19, 104 S.Ct. at 1562.

PMBR's evidence includes the following:

1) Defendants stipulated that full-service courses and supplemental MBE workshops are in separate product markets.

2) Defendants have marketed their full-service course and their supplemental workshop as separate products, for separate fees, for over a decade and still offer Gilbert separately.

---

**3.** The district court also erred by relying, for its analysis of this section 1 issue, on *Telex Corp. v. IBM Corp.*, 510 F.2d 894 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), a section 2 monopolization case.

**4.** Product improvements may be the cause and/or effect of changes in consumer demand, but the nature of that demand is what counts.

3) In Kansas, Ohio and Hawaii, HBJL and/or its licensees still offer the full-service course unbundled from Gilbert.

4) Prior to Defendants' bundling, not every full-service course customer chose to purchase a supplemental workshop; in Colorado, only one-third to one-half did so.

5) In the past, HBJL officials worked to keep their external Gilbert workshop separate and distinct in customers' minds from the HarBrace workshop within the full-service course, because many customers preferred to buy from two different companies to get multiple providers' perspectives on the MBE.

6) Defendants have not consolidated the operation of the full-service and supplemental courses; Gilbert continues to be administered and marketed separately.

7) One or more of Defendants' officers contemplated that the inclusion of the Gilbert workshop in the full-service course at no added charge would be only temporary.

8) Other bar review industry participants view full-service and supplemental MBE courses as separate products.

This evidence is sufficient to create a material factual dispute over whether there is enough consumer demand in Colorado for full-service courses without supplemental MBE workshops to make it efficient to sell the two separately. If there is, then the BAR/BRI–Gilbert package should be viewed as two products.

b. *The Conditioning Requirement*

■ The final element of an illegal tying arrangement is conditioning. For an illegal tie-in to exist, " 'purchases of the tying product must be conditioned upon purchases of a distinct tied product.' " *Continental Trend Resources, Inc. v. Oxy USA, Inc.,* 44 F.3d 1465, 1481 (10th Cir.1995) (quoting *Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.,* 806 F.2d 953, 957 (10th Cir.1986)), *petition for cert. filed,* 63 USLW 3819 (U.S. May 8, 1995) (No. 94–1838). HBJL and CBR argue that this element requires a showing of coercion, and that by adding Gilbert to BAR/BRI in the summer of 1992 they did not force or coerce any BAR/BRI students to forgo

PMBR's supplemental workshop; since they did not raise BAR/BRI tuition, the economic incentives remained the same as before.

The Defendants are correct with respect to the summer 1992 course, when the bundled BAR/BRI–Gilbert course cost the same as the separate BAR/BRI course had cost previously. It appears that Gilbert truly was free to BAR/BRI customers during that summer's session, so that no separate, tied purchase was involved.

■ HBJL and CBR do not address, however, the evidence that in the winter 1993 course they raised the tuition of the bundled course by $50, in part to cover some of the costs of providing Gilbert. Where the price of a bundled product reflects any of the cost of the tied product, customers are purchasing the tied product, even if it is touted as being free. *See Directory Sales Management Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 610 (6th Cir.1987); 3 Phillip E. Areeda & Donald F. Turner, *Antitrust Law* ¶ 733a (1978) ("[T]he tie may be obvious as in the classic form, or somewhat more subtle, as when a machine is sold or leased at a price that covers 'free' servicing.").

PMBR has presented enough evidence to create a triable issue as to whether the tuition for the bundled BAR/BRI course covered some portion of the Gilbert costs in 1993, and therefore whether the conditioning element was satisfied. *See* Plaintiff–Appellant's App. at 207–08 (Summary). Summary judgment on the tie-in claim therefore was premature.

2. *Section 1 Predatory Pricing Claim*

PMBR has alleged that by packaging Gilbert with BAR/BRI for a nominal or no charge, HBJL and CBR engaged in predatory pricing, in violation of both section 1 and section 2 of the Sherman Act.

■ To establish a section 1 violation, PMBR must show a conspiracy to engage in short-term price cutting to secure long-term monopoly profits. *Instructional Sys. Dev. Corp. v. Aetna Casualty & Sur. Co.,* 817 F.2d 639, 649 (10th Cir.1987). To be predatory, prices must be set below "an appropriate

measure" of costs. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* — U.S. —, —, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993).[5] Because of the time value of the money lost through price cuts and the uncertainty involved in predatory pricing schemes, the Supreme Court has said such a conspiracy is rational only if the conspirators "have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588–89, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *cf. Brooke Group,* — U.S. at — – —, 113 S.Ct. at 2587–89 (discussing the elements of predatory pricing under Sherman Act section 2 and the Robinson–Patman Act).[6]

The district court dismissed PMBR's predatory pricing claim because it found that the bundled BAR/BRI–Gilbert course was a single product, and PMBR had not alleged that the package was priced below cost. As noted above, however, we find that a factual dispute remains as to the existence of two products.

■ The parties do not appear to dispute for summary judgment purposes the joint action element of the conspiracy claim. Nor do Defendants disagree that in the summer 1992 course, they included Gilbert for free, a level below any measure of Gilbert's costs.[7] We see no evidence in the appellate record,

however, of any below-cost pricing in the winter 1993 course, when tuition was raised by $50. *See* Plaintiff–Appellant's App. at 344 (Baseman Aff.Ex. 4.) The only Gilbert cost evidence we have located in the record shows that the cost of Gilbert materials was approximately $15 per person. *See id.* at 452, 458 (Davis Dep.).

HBJL and CBR argue that PMBR has failed to show any evidence that they are likely to be able to recoup, with interest, their losses from any alleged predatory pricing. As discussed infra in our review of the section 2 claims, we find that PMBR has adduced enough evidence of high entry barriers and other structural factors in the supplemental market to create a triable issue as to this element. We therefore conclude that summary judgment on the section 1 predatory pricing claim was premature.

### 3. Section 2 Attempted Monopolization of Supplemental MBE Course Market

PMBR alleges that HBJL and CBR attempted to monopolize the supplemental MBE workshop market by means of tying, predatory pricing, false advertising, and the creation of schedule conflicts. The district court dismissed the attempt claim after deciding that tying and predatory pricing could not have occurred because only a single product was involved, that any reasonable

---

**5.** Unfortunately for litigants, neither the Supreme Court nor we have taken a position on which of various cost measures is the definitive one, although we have spoken of marginal and average variable costs as being relevant. *See Brooke Group,* — U.S. at — n. 1, 113 S.Ct. at 2588 n. 1; *Instructional Sys.,* 817 F.2d at 648; *Pacific Eng'g & Prod. Co. of Nevada v. Kerr–McGee Corp.,* 551 F.2d 790, 797 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

**6.** Separate from but closely related to the question of whether a defendant's acts are likely to succeed is the question of whether a defendant with a monopoly in one market would have any plausible reason to use its monopoly profits in that market to subsidize predation in a second market. *See Matsushita,* 475 U.S. at 596, 106 S.Ct. at 1361 (requiring a showing of plausible motive for predatory pricing and observing that "a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another").

Here, where PMBR has presented evidence that it was probably the most likely challenger to the Defendants' monopoly in the Colorado full-service market, we cannot say as a matter of law that Defendants would find it economically irrational to price below cost in the MBE market for the summer 1992 course as part of a larger scheme, employing tie-ins and schedule conflicts, to monopolize the supplemental market, in order to discipline PMBR for refusing to allocate markets and to deprive PMBR of the resources necessary to continue its full-service market incursions.

**7.** Although the record below is somewhat ambiguous, HBJL and CBR do not appear to seriously dispute on appeal that if the BAR/BRI–Gilbert package does comprise two separate products, then the relevant product for predatory pricing's cost-price analysis is the supplemental workshop, rather than the package.

juror would find the inclusion of Gilbert in the BAR/BRI course to be a procompetitive product improvement, and that PMBR had failed to show a triable issue as to the existence of schedule conflicts and false advertising.

PMBR argues on appeal that summary judgment was inappropriate as to each type of anticompetitive act alleged. HBJL and CBR argue that the district court's reasoning was sound, and that, in addition, PMBR has failed to show the requisite dangerous probability that the Defendants will succeed in monopolizing the supplemental MBE workshop market.

■ To succeed on an attempted monopolization claim, PMBR must show: (1) relevant geographic and product markets; (2) specific intent to monopolize; (3) anticompetitive conduct in furtherance of an attempt to monopolize; and (4) a dangerous probability of success. *See TV Communications Network, Inc. v. Turner Network Tel., Inc.*, 964 F.2d 1022, 1025 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992). The parties do not appear to contest the first and second elements for summary judgment purposes. We proceed, therefore, to examine the evidence with respect to conduct and probability of success.

### a. *Anticompetitive Conduct*

■ Anticompetitive or exclusionary conduct under section 2 is "conduct constituting an abnormal response to market opportunities. Predatory practices are illegal if they impair opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such competition," if the conduct appears "reasonably capable of contributing significantly to creating or maintaining monopoly power." *Instructional Sys.*, 817 F.2d at 649 (citations omitted). A defendant may avoid liability by showing a legitimate business justification for the conduct. *See Kodak,* 504 U.S. at 483, 112 S.Ct. at 2090–91.

### (1) *Tying and Predatory Pricing*

■ As discussed above, PMBR has shown enough evidence to create triable is-

sues as to the existence of a predatory pricing conspiracy in 1992 and a tying arrangement in 1993 in violation of section 1. Illegal tie-ins and predatory pricing under section 1 may also qualify as anticompetitive conduct for section 2 purposes. *See, e.g., Directory Sales,* 833 F.2d at 613; *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 541 (7th Cir.1986); *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 981 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *see also* Areeda & Turner, *supra* ¶ 733c.

HBJL and CBR offer three justifications, however, which they say made the inclusion of Gilbert "for free" as part of the BAR/BRI course permissible competitive activity. First, they argue that since supplemental MBE workshops were being offered "for free" as part of full-service courses in Colorado by SMH and outside Colorado by PMBR, SMH, and other providers, they (HBJL and CBR) were entitled to meet their competitors' prices, even if those prices were predatory. Second, they contend, they were entitled to use legal and ordinary marketing methods such as bundling to respond to PMBR's and SMH's "attack" advertisements, which criticized Defendants for charging "extra" for their MBE workshop. Third, they argue, the bundling of Gilbert with BAR/BRI was a procompetitive improvement of their full-service course.

### (a) *Meeting competition*

■ Determining when the meeting-competition defense properly applies to a predatory pricing claim can require substantial analysis. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 717' (Supp. 1994). But Defendants have not shown, at any rate, why they should be allowed to price Gilbert below cost in Colorado in order to meet PMBR's prices in California, Alabama, Tennessee, and Georgia. And PMBR has offered enough evidence to create a triable issue regarding whether HBJL and CBR were truly concerned about and responding to competition from SMH. *See* Plaintiff-Appellant's App. at 203 (Summary).

### (b) *Ordinary marketing methods*

■ HBJL and CBR say their "free" inclusion of Gilbert in the BAR/BRI course was nothing more than one of the "legal and ordinary marketing methods already used by others in the market" that we have previously said even monopolists are free to use. *See Telex*, 510 F.2d at 927. We do not necessarily read *Telex* to mean that absolutely every marketing method available to any nonmonopolist is equally proper when used by a monopolist, since such a reading might eliminate the law on tying arrangements. But in the supplemental MBE market, where HBJL and CBR were not monopolists, they may have been at liberty to temporarily engage in promotional pricing—even giving Gilbert away free—to try to boost the sales of a product that consumers were rejecting. A problem in this case, however, is that they did not offer Gilbert free to every prospective Gilbert customer. Instead, they offered it free only to purchasers of their monopolized BAR/BRI course. Although, as we noted above, this could not have constituted an illegal tying arrangement in 1992 because the allegedly tied Gilbert product was not purchased, neither can we find this linking of a product giveaway to monopoly power in a separate market to be a legal and ordinary marketing method, absent some showing of legitimate business reasons for distinguishing the BAR/BRI customers from other purchasers of Gilbert.[8] *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1059–62, 1065 (3d Cir.1978), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

### (c) *Product improvement*

■ Product improvement can sometimes be a defense to a section 2 claim.[9] *See, e.g., Telex*, 510 F.2d at 906, 926–27; *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 443–44 (N.D.Ca.1978), *aff'd sub nom Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). PMBR argues, however, that the Defendants' product improvement justification at most creates a factual dispute. PMBR contends that its evidence shows that the claimed improvement was neither intended as an improvement nor accepted by the market as one.

■ Both the purpose and results of a product change, including customers' reception of the change, are relevant to whether a claimed product improvement is pro- or anti-competitive.[10] *See In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F.Supp. 965, 1003–05 (N.D.Cal.1979), *aff'd sub nom.*

---

8. We recognize the split among the circuits regarding the legality of so-called "monopoly leveraging," i.e., using a monopoly in one market to gain a competitive advantage in a second, where the purpose is not to monopolize or attempt to monopolize the second market. *Compare, e.g., Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275–76 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), *with Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546–49 (9th Cir.1991), *cert. denied*, 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992). Our case falls outside this debate, however, because PMBR has specifically alleged an attempt to monopolize the supplemental MBE workshop market.

9. It may seem contradictory that a product improvement motivation—at least without something more, such as demonstrated efficiencies—will not save an otherwise illegal tying arrangement under section 1, *see Jefferson Parish*, 466 U.S. at 25 n. 41, 104 S.Ct. at 1565 n. 41, but it may still weigh in the balance in section 2 analysis. The two sections are distinct, however, and the section 2 balancing test is different from the analysis for per se offenses under section 1.

10. Professors Areeda and Hovenkamp, who argue for a rule of presumptive legality for all product changes, concede the possible anticompetitive nature of what they term "implicit tying" through product integration. *See* Areeda & Hovenkamp, *supra* ¶¶ 738.1 & 738.4. But they say an inquiry into whether a defendant's intent was actually to harm rivals, as distinct from making a better product, is difficult, costly, and usually pointless, because the evidence is frequently mixed or ambiguous. *See id.* ¶ 738.4e. And they say an objective appraisal of whether a product change truly is an improvement—let alone whether a given improvement could have been achieved with less harm to competition—will often be beyond the courts' competency and may seriously chill innovation. *See id.* ¶ 738.4f.

We are sensitive to both the difficulties and the dangers of these inquiries. Where, as here, however, the claimed product improvement takes the form of a marketing change, rather than some complex technological integration of previously separate functions, our degree of deference to product designers is reduced.

*Transamerica Computer Co., Inc. v. IBM Corp.,* 698 F.2d 1377 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). *But see Telex Corp. v. IBM Corp.,* 367 F.Supp. 258, 347 (1973) (refusing to second-guess technological justifiability of integrating more internal memory into computer's central processing unit where integration reduced costs and increased utility), *rev'd on other grounds,* 510 F.2d 894 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

### 1) *Purpose of product change*

■ PMBR has offered evidence that the bundling was a response to PMBR's refusal to take part in a proposed market allocation agreement, *see* Plaintiff–Appellant's App. at 193–94 (Summary); that Defendants' executives never have believed that bar applicants need Gilbert to pass the bar, *id.* at 201 (Summary); that Defendants intended the bundling to be only temporary, *id.* at 199 (Summary); and that bundling cannot reasonably be explained as a response to competitive market conditions where, prior to the bundling of Gilbert, Defendants' course already had more MBE workshop hours than SMH's full-service course, and where SMH's then-partner, Kaplan, went bankrupt around the time the Gilbert bundling began in Colorado. *Id.* at 203 (Summary).

### 2) *Customer reception of product change*

PMBR also cites evaluations from bar applicants in California and elsewhere outside of Colorado, in the summer of 1992, who described the "free" Gilbert sessions as "horrible," "a waste of time," "awful" and "a joke." *See id.* at 201–02 (Summary).[11] PMBR offers evidence that immediately prior to bundling, one-half to two-thirds of Colorado bar applicants who took a full-service course did not choose to take a supplement, *see id.* at 189–90 (Summary), and that many prefer to take their MBE workshop from a different provider than their full-service company. *See id.* at 547 (Reed Dep.).

### 3) *Results of product change*

PMBR further argues that if the addition of Gilbert had actually improved the product, one would expect Defendants' share of the full-service market and the pass rate of its course enrollees to have increased, but in fact they declined. The Defendants' market share—as measured by the percentage of first-time Colorado bar exam takers taking the BAR/BRI course—dropped from 76 percent in 1991 to 72 percent in 1993, *see id.* at 336–37 (Baseman Aff.Ex. 2), and BAR/BRI customers' pass rate declined from 5 percentage points above the Colorado average in July 1990 to 1 percentage point above the state average in July 1992. *See id.* at 413–14 (Sullivan Aff.Exs. 12, 13).

Taken together, the preceding evidence is enough to create a triable issue regarding the validity of the Defendants' product improvement justification for the alleged tying and predatory pricing behavior. In sum, PMBR has sufficiently controverted for summary judgment purposes the arguments that the Defendants were only responding to competition, that they used nothing more than legal and ordinary marketing methods, and that the bundled course was a procompetitive product improvement.

### (2) *Schedule Conflicts*

■ PMBR also claims the Defendants deliberately created scheduling conflicts between the BAR/BRI course and PMBR's workshop in furtherance of their attempt to monopolize the workshop market. PMBR offers evidence of increased numbers of schedule conflicts nationwide, e.g., 23 conflicts in the summer of 1990, 2 of them major, versus 37 conflicts in the summer of 1992, 17 of them major, *see* Plaintiff–Appellant's App. at 206 (Summary); *id.* at 370–71 (Feinberg Aff.); and three specific conflicts in Colorado, in the summer 1991, winter 1991 and summer 1992 courses. *Id.* at 366–68.

PMBR contends that the increased conflicts were intended to discourage people from taking PMBR's workshop. The district

---

**11.** While the evaluations are not from Colorado students, neither side has suggested they are irrelevant because either the Gilbert course or the students taking it are different in Colorado than elsewhere.

court held that where PMBR's workshop ran from 9 a.m. to 4 p.m., and the Defendants' classes ran from 6 p.m. to 9 p.m., no reasonable juror could find that any schedule conflicts existed. HBJL and CBR further point out that BAR/BRI students who wished to attend PMBR's course could check out audiotapes of the BAR/BRI lectures at any time or attend videotape replays at various locations.

PMBR argues on appeal that the court erred in concluding that to be actionable, the schedule conflicts had to make it impossible, rather than merely inconvenient, for BAR/BRI students to take PMBR's workshop. We agree. The relevant inquiry is whether the Defendants' scheduling patterns were anticompetitive, i.e., "an abnormal response to market opportunities ... impair[ing] opportunities of rivals and ... not competition on the merits or ... more restrictive than reasonably necessary for such competition." *Instructional Sys.*, 817 F.2d at 649. What matters is not so much whether the classes actually overlapped as whether the scheduling pattern was reasonably capable of contributing significantly to a monopolization attempt by discouraging BAR/BRI customers from taking PMBR's course, and, if so, whether it was nevertheless justified.

PMBR presented enough evidence to create a triable issue as to whether this same-day scheduling could significantly discourage BAR/BRI students from taking its workshop. *See* Plaintiff–Appellant's App. at 365–72 (Feinberg Aff. ¶¶ 41–63).[12] The Defendants contend, however, that even if there were conflicts, they were justified, because the

overwhelming likelihood "is that any same-day scheduling was the inevitable result of two courses attempting to shoe-horn their complex schedules into the same narrow time frame." Defendants–Appellees' Br. at 28.

PMBR offers circumstantial evidence that the three schedule conflicts it has identified in Colorado were not accidental or inevitable, but instead deliberate and unjustified. PMBR points to a substantial increase nationwide in the number of conflicts after HBJL's Mr. Conviser allegedly proposed the illegal market allocation agreement in 1989 and PMBR's Mr. Feinberg rejected it in the spring of 1990. Mr. Feinberg stated by affidavit that there have always been conflicts between PMBR's course and that of BAR/BRI and its licensees, including CBR, but the vast majority were minor or inconsequential until 1991 and thereafter. *See* Plaintiff–Appellant's App. at 366–72 (Feinberg Aff. ¶¶ 47–63). This sequence of events is enough to create a jury question as to whether the disputed schedule conflicts in Colorado were deliberate or the "inevitable result" of crowded curricula and short time frames.

### (3) *False Advertising*

■ PMBR contends that Defendants advertised falsely when they advertised that their BAR/BRI course included the Gilbert workshop "for free." In 1993, PMBR points out, Defendants raised the price of the BAR/BRI course by $50, and an HBJL official testified that the added cost of Gilbert was one of the reasons for the tuition increase. *See id.* at 207–08 (Summary). The district

---

**12.** Defendants argued below that they had no duty to accommodate PMBR's scheduling. They analyzed the situation as a monopolist's refusal to cooperate with a competitor and read *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603, 105 S.Ct. 2847, 2857–58, 86 L.Ed.2d 467 (1985), as standing for the proposition that a monopolist has a duty to assist a competitor only where the monopolist has accommodated the competitor in the past and then abruptly terminates assistance. We do not necessarily interpret *Aspen Highlands* as narrowly as do the Defendants, but principles governing refusals to deal do not control here anyway.

PMBR's complaint goes beyond merely alleging that Defendants refused requests to affirmatively accommodate PMBR's course. PMBR alleges that the Defendants deliberately created

schedule conflicts to avoid helping PMBR, and in fact, to harm PMBR. Since the Defendants naturally would not create conflicts between their BAR/BRI full-service course and their own MBE workshop, Gilbert, *see* Plaintiff–Appellant's App. at 370 (Feinberg Aff. ¶ 58), there is a triable issue as to whether schedule conflicts between BAR/BRI and PMBR's MBE workshop would disproportionately raise PMBR's costs. *See Premier Elec. Constr. Co. v. National Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 368 (7th Cir.1987) (citing Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986)). This would qualify as anticompetitive conduct unless HBJL and CBR could demonstrate a legitimate business justification for it.

court found no triable issue, because Gilbert was being offered as part of the full-service course and, "I guess that is free to that extent." *Id.* at 313 (Tr.Summ.J.Hr'g).

We affirm for a different reason. Even assuming the advertising was false, PMBR has not shown how it could have contributed to an attempt to monopolize the supplemental MBE market, rather than just to maintenance of Defendants' full-service course monopoly. PMBR has not adduced any evidence that had BAR/BRI enrollees known the alleged "truth"—that they were not getting Gilbert for free but were being forced to pay for it in order to get the desired BAR/BRI course—they would have been more likely to spend another $300 or so to take PMBR or another MBE workshop in addition to the BAR/BRI–Gilbert course. We therefore affirm the district court's rejection of false advertising as an anticompetitive act in furtherance of the attempted monopolization claim.

b. *Dangerous Probability of Success*

As an alternative basis for affirming the district court's dismissal of the attempted monopolization claim, HBJL and CBR argue that PMBR has failed to demonstrate a dangerous probability that their alleged attempt will succeed. PMBR contends that it has provided ample evidence.

■■■■ "To establish the dangerous probability of success element of an attempted monopolization claim, 'the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 894 (10th Cir.1991) (quoting *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America,* 885 F.2d 683, 693 (10th Cir.1989), *cert. denied,* 498 U.S. 972, 111 S.Ct. 441, 112

L.Ed.2d 424 (1990)). Factors relevant to determining dangerous probability include, but are not limited to, a defendant's market share, whether the defendant is a multimarket firm, the number and strength of other competitors, market trends, and entry barriers. *See id.; Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.,* 783 F.2d 159, 162 (10th Cir. 1986). Where predatory pricing is alleged, the defendants' financial strength and ability to absorb losses are also relevant. *See Brooke Group,* —— U.S. at ——, 113 S.Ct. at 2589; *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 119 n. 15, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986). Because we are talking about probabilities, it is not necessary for a defendant to already possess monopoly power in the target market; indeed, if it did, the offense would be monopolization, not attempt. Of course, "[t]he higher the firm's initial market share, the greater the likelihood that it will eventually gain monopolistic control over the market." *Colorado Interstate Gas,* 885 F.2d at 694.

*(1) Defendants' Market Share/Multiple Markets*

■■■■ "The [market] share that is relevant for determining whether the defendant can satisfy the 'dangerous probability of success' requirement of attempted monopolization should be either that which he possesses at the time of litigation or the largest share he possessed during the period of the alleged offense." Areeda & Hovenkamp, *supra* ¶¶ 711.2d, 835.2b.[13] No specific minimum market share is universally accepted. But in this case, the Defendants stipulate that they possess monopoly power in the full-service course market, which is closely related to the target supplemental workshop market; they are accused of leveraging that power to increase their share of the supplemental market; their share of the supplemental market

**13.** Professors Areeda and Turner, in their earlier, 1978 main volume, said some courts have required a showing that a defendant possessed a significant share of the target market at the time when the challenged conduct was undertaken, and they cite, inter alia, to one of our cases as standing for that proposition. *See E.J. Delaney Corp. v. Bonne Bell, Inc.,* 525 F.2d 296 (10th Cir.1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976) (cited in *Areeda & Turner, supra* ¶¶ 831, 835a). We do not read *Delaney* as clear support for such a rule, but even if it were, we would hold it distinguishable from this case, where the Defendants are accused of leveraging their monopoly power in a second market to gain a new monopoly in the target market.

went from less than 2 percent in the winter of 1992 to more than 70 percent within a year, while the share of their major competitor, PMBR, went from 84 percent to 23 percent in the same period (and from 22,000 nationwide in 1990 to 14,000 in 1992).[14] *Fiberglass Insulators, Inc. v. Dupuy*, No. Civ.A. 84–1244–1, 1986 WL 13356 at **3–4 (D.S.C. Sept. 30, 1986) (denying summary judgment on attempted monopolization claim where defendant's market share increased from 5 percent to nearly 51 percent in four years); *Indiana Grocery Co. v. Super Valu Stores, Inc.*, 647 F.Supp. 254, 258 (S.D.Ind. 1986) (refusing to dismiss attempted monopolization case for failure to state a claim where defendant, a new market entrant with extensive resources, obtained a 15 percent market share in 18 months).

### (2) *Defendants' Resources*

PMBR has presented evidence that Defendants have access to substantial money with which to sustain a predatory campaign. HBJL's parent company, General Cinema, had total assets of over $5.5 billion as of Jan. 31, 1993, compared with PMBR's assets of less than $1.042 million as of June 30, 1993. *See* Plaintiff–Appellant's App. at 200 (Summary).

### (3) *Number and Strength of Competitors*

PMBR's market structure evidence suggests that if PMBR is seriously damaged or eliminated, remaining competitors in the supplemental market may not be able to compete effectively against Gilbert. The Colorado supplemental MBE market is highly concentrated, dominated by PMBR and the Defendants. The other two competitors—APTS and Reed Law Group—have been relatively weak in Colorado. In 1993, Defendants had 76.2 percent of the market; PMBR had 22.6 percent, and APTS had 1.2 percent. *Id.* at 339 (Baseman Aff. Ex. 3). Reed cancelled its 1993 workshops. *Id.* at

361 (Feinberg Aff.). SMH offered a workshop in 1991, but it is unclear to us whether they still compete in the supplemental market.

### (4) *Market Trends*

The trends in the supplemental MBE market, as reflected in PMBR's evidence, provide additional support for PMBR's claim. PMBR's market share increased from 71 percent to 84 percent between 1989 and 1991, but dropped to 25 percent in 1992 and to 23 percent in 1993. The Defendants' market share showed an opposite trend, dropping from 29 percent to 11 percent between 1989 and 1991, then increasing to 72 percent by the end of 1992 and 76 percent in 1993. Figures for the third competitor, APTS, available for 1991–93, showed a steady decline from 4 percent in 1991 to 1 percent over that period.

### (5) *Entry Barriers*

PMBR has also offered evidence that if PMBR is eliminated, new market entrants may not be able to establish a competitive MBE workshop market. PMBR's economic expert testified that entry barriers exist in both the full-service and the supplemental MBE markets in Colorado, because of Defendants' high degree of name recognition and accumulated goodwill, HBJL's large size nationwide, HBJL's economies of scope and scale in the full-service market, and the widespread discounting practices of the bar review industry. *See id.* at 323–24 (Baseman Aff.). PMBR has presented further evidence of entry barriers in that there have been only three attempted entries in the Colorado supplemental MBE market since 1972, two of them largely unsuccessful. *Id.* at 192 (Summary), 361 (Feinberg Aff.).

The preceding evidence of the Defendants' market share and resources, the nature of the competition they face, and the barriers to

---

**14.** The Defendants complain that PMBR arrived at the high market share for them by counting every sale of the Defendants' full-service course as a sale of a supplemental MBE workshop after the Gilbert inclusion in the summer of 1992. But they do not show why this is conceptually wrong, at least for 1993, when the evidence shows that part of the fee increase charged to enrollees was to cover Gilbert costs, so that we can fairly call the Gilbert enrollments "sales." At any rate, we accept PMBR's numbers for summary judgment purposes. *See Kodak*, 504 U.S. at 452–58, 112 S.Ct. at 2076–77.

entry in the supplemental workshop market, are sufficient to create a material factual dispute with regard to dangerous probability of success. A jury question exists as to whether HBJL and CBR, by predatorily pricing Gilbert sales to BAR/BRI customers in the summer 1992 course and then subsequently tying the BAR/BRI course to purchases of Gilbert, and by creating scheduling conflicts with PMBR's course, could so harm PMBR and other MBE providers that HBJL and CBR could monopolize the MBE market and maintain that monopoly long enough to recoup any predatory pricing losses plus interest. Although many subissues are subject to serious factual dispute, summary judgment on the attempt claim was premature.

### 4. Section 2 Conspiracy to Monopolize Supplemental MBE Market

PMBR next contends that the district court erred in dismissing its section 2 claim of conspiracy to monopolize the supplemental MBE market, because all of its elements except one—the existence of a conspiracy—are subsumed in the attempt claim, and it has provided evidence of the conspiracy element as well.

To succeed on a claim of conspiracy to monopolize, PMBR must show: "(1) 'the existence of a combination or conspiracy to monopolize'; (2) 'overt acts done in furtherance of the combination or conspiracy'; (3) 'an effect upon an appreciable amount of interstate commerce'; and (4) 'a specific intent to monopolize.'" *TV Communications,* 964 F.2d at 1026 (quoting *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 438 (10th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983)).

■ As to the conspiracy element, PMBR has presented evidence that major decisions regarding the Colorado course, such as pricing and course content, required the approval of HBJL as well as CBR. *See* Plaintiff–Appellant's App. at 206–07 (Summary); *id.* at 455 (Davis Dep.). We agree that this evidence, when combined with the evidence supporting the attempt claim, creates a triable issue and precludes summary judgment on the conspiracy claim.

### 5. Monopolization of and Conspiracy to Monopolize Full–Service Bar Review Market

PMBR alleges that HBJL and CBR were guilty of Sherman Act section 2 monopolization of and conspiracy to monopolize the full-service bar review market by means of a geographic market allocation agreement, which is illegal per se under section 1.

HBJL and CBR reply that PMBR lacks standing, that a 1990 release agreement and the statute of limitations bar this claim, and that PMBR has not presented evidence that an illegal market allocation agreement ever existed. The district court appears to have relied on the 1990 release agreement in dismissing this claim. Although the court also mentioned the statute of limitations, it does not appear to have made a specific finding based on it. We conclude that PMBR has failed to establish a triable issue regarding the existence of an illegal agreement.

■ Defendants correctly argue that ambiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy under Sherman Act section 1. *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356–57. A plaintiff must offer evidence tending to exclude the possibility that the alleged conspirators either acted independently or colluded in a way that could not have harmed the plaintiff. *Id.; Gibson v. Greater Park City Co.,* 818 F.2d 722, 724 (10th Cir.1987).

■ We agree with the Defendants that the mere fact that they were competitors before their licensing arrangement and stopped competing afterward is not enough to show that they secretly and illegally divided the market between them. Their written agreements contained no noncompete clauses, but once they entered their licensing arrangement, both companies had legitimate business reasons not to compete and undermine the BAR/BRI trademark's value.

■ Also ambiguous is the evidence that CBR's founder, Jerry Kopel, once threatened to offer competing bar review courses outside Colorado if HBJL did not give him more

favorable license terms, but that he ultimately did not carry out his threat. This can be read, as PMBR reads it, to mean that Mr. Kopel was threatening to violate an existing secret agreement not to compete, but it also can be viewed as the normal posturing that occurs in any contract renegotiations.

 Nor do we consider that the balance is tipped by the evidence that HBJL entered into an explicit market allocation agreement with a former competitor in Georgia in 1980, *see Palmer*, 498 U.S. at 49–50, 111 S.Ct. at 402–03, and that it proposed market allocation agreements to Josephson's Bar Review in 1969, to SMH Bar Review in 1976 and 1980, and to PMBR in 1989–90. The timing of these various offers permits two opposite inferences to be drawn. Although PMBR insists that this evidence shows a consistent pattern of behavior, all of the alleged offers were made before November 1990. In that month, the Supreme Court ruled in *Palmer* that HBJL's market allocation agreement with BRG was "unlawful on its face." *Id.* at 50, 111 S.Ct. at 403. It is clearly possible to infer that in 1991, when HBJL and CBR orally renewed their Colorado licensing agreement, they were aware of the illegality of any market allocation agreement and did not pursue or renew any such agreement.

Since all of PMBR's evidence relative to the existence of a secret market allocation agreement is ambiguous, it cannot support an inference of conspiracy to monopolize the full-service course market, and we affirm the district court's dismissal.[15]

### B. *CONFIDENTIALITY ISSUES*

PMBR appeals the district court's refusal to set aside under Fed.R.Civ.P. 72(A) a magistrate judge's orders concerning disclosure of confidential information in the record. The basis for the court's ruling is not clear, but because we are remanding the case, this order becomes interlocutory and subject to reexamination upon renewed motion by PMBR. We therefore decline to address it at this juncture.

## IV.  CONCLUSION

For the reasons discussed above, the district court's judgment is REVERSED IN PART, AFFIRMED IN PART, and REMANDED.

---

15. Although the 1990 settlement agreement released any claims PMBR might have had against HBJL based on pre–1990 activities, PMBR contends that it still has a cause of action for that time period against CBR, which was not a party to the settlement. But even assuming that CBR is not protected by the 1990 release, PMBR's evidence that HBJL proposed or entered into market allocation agreements with other companies in other states in 1969, 1976, 1980, and 1989, without more, is simply too remote to furnish the basis for a conspiracy claim against CBR on grounds that CBR and HBJL, or their predecessors, allocated the Colorado and Wyoming markets in 1974, 1982, 1986, and 1988. (The latter dates are the years when CBR made or renewed its written license agreements.)