**DIRECTORY SALES MANAGEMENT CORPORATION, Plaintiff–Appellant,**

v.

**OHIO BELL TELEPHONE COMPANY; American Information Technologies Corporation; and Ameritech Publishing, Inc., Defendants–Appellees.**

No. 86–3773.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 21, 1987.

Decided Nov. 18, 1987.

Mark B. Cohn (argued), Cleveland, Ohio, for plaintiff-appellant.

John S. Searles, Ohio Bell Telephone Co., Cleveland, Ohio, Nathaniel Hawthorne, for Ohio Bell Telephone Co.

David M. Bernick (argued), Kirkland & Ellis, Chicago, Ill., David T. Erie, for defendants-appellees.

Before KENNEDY and KRUPANSKY, Circuit Judges, and BROWN, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiff–Appellant Directory Sales Management Corporation ("DSM") appeals the District Court's judgment granting the motion for summary judgment of Defendants–Appellees, Ohio Bell Telephone Company ("Ohio Bell"), Ameritech Publishing, Inc. ("API"), and American Information Technologies Corporation ("Ameritech"), (collectively "Defendants"). On appeal DSM claims that there are material issues of fact as to whether the Defendants engaged in a *per se* illegal tying arrangement, leveraged their monopoly in the telephone business to restrain competition in the yellow pages business, and monopolized the business of yellow pages. We agree with the District Court that Defendants were entitled to summary judgment, and affirm.

Prior to the 1984 reorganization of American Telephone and Telegraph Co. ("AT & T"), Ohio Bell was a subsidiary of AT & T. Ohio Bell conducted the yellow pages directory business through one of its departments. Following the reorganization, Ameritech was formed as one of seven new regional telephone companies, covering the Midwest area of the United States. Ohio Bell became a wholly-owned subsidiary of Ameritech. Another wholly-owned subsidiary, API, became responsible for publishing the yellow pages. Prior to the reorganization, Ohio Bell and API entered into a Publishing Services Contract ("PSC") to govern the publishing services by API to Ohio Bell and intracorporate payments between the two companies. Ohio Bell and API designed the PSC to continue the historical subsidy that ran from the yellow pages business to the business telephone rates. The PSC requires API to pay an annual fee to Ohio Bell for the "exclusive rights to publish Yellow Pages Directories bearing [Ohio Bell's] name ..., to co-bind the Yellow Pages Directories with [Ohio Bell's] White Pages Directories, to solicit advertising in Yellow Pages Directories in [Ohio Bell's] name, and for the services performed by [Ohio Bell]." Joint Appendix at 418–19. Ohio Bell pays the direct costs that API incurs in printing the white pages, but it is not responsible for any other cost or expense incurred by API in performing the PSC. The PSC also requires that API offer one yellow page listing free to each business telephone subscriber. The PSC also allows for simultaneous delivery of white pages and yellow pages to the subscriber, and provides that Ohio Bell will bill and collect API's yellow page advertising charges and will supply API with listing information, including preliminary yellow page business classification information.

On March 8, 1984, DSM, a publisher of yellow pages, filed this action in the United States District Court for the Northern District of Ohio. The complaint's first count alleged that the Defendants tie the sale of business telephone service to the free yellow pages listing in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 ("section 1")[1]. The second count alleged that the services that Ohio Bell provides to API violate section 1 under the Rule of Reason. The third count alleged that the Defendants have conspired to monopolize and in fact monopolize the yellow pages market in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 ("section 2").

The District Court granted the Defendants' motion for summary judgment on all three counts, finding that they had demonstrated that no tying arrangement existed, that DSM's second count failed to state a claim, and that the Defendants had shown that they did not use anticompetitive or exclusionary means to compete and consequently did not violate section 2.

**I.**

DSM raises a preliminary issue as to whether the District Court improperly

---

1. The complaint also alleged a violation of section 3 of the Clayton Act, 15 U.S.C. § 14. The District Court dismissed the Clayton Act claim on the grounds that telephone service is not a good or commodity. That dismissal is not appealed.

granted summary judgment in light of DSM's lack of full discovery. In response to DSM's Fed.R.Civ.P. 30(b)(6) discovery request the Defendants produced three witnesses: David Clemons, General Sales Manager for API; Theodore Kukla, Division Manager of Financial Analysis and Regulatory Matters for Ohio Bell; and John McDougald, District Manager, Budgets, in the Comptroller's Organization of Ohio Bell. DSM claims that these three deponents are insufficient, arguing that 1) the Defendants refused to say to which of the 26 categories listed in DSM's Fed.R. Civ.P. 30(b)(6) motion the three witnesses could testify; 2) the Defendants failed to give DSM the necessary discovery with respect to a study of the business of yellow pages; 3) Defendants' witnesses were unable to explain the current practices of Ohio Bell service representatives who accept orders for new business telephone service; and 4) none of the witnesses were able to explain the effect of Ameritech's formation on the rates that Ohio Bell charges.

A district court has broad discretion over the scope of discovery. *Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 206 (6th Cir.1986). DSM was able to depose three knowledgeable witnesses and had access to the PSC, which by its terms contains all the arrangements between Ohio Bell and API. Furthermore, DSM did not move to compel discovery after it had deposed the witnesses. The evidence supports the District Court's findings that as to each of the areas DSM sought to inquire, DSM had either obtained sufficient discovery or the further requested discovery was not relevant to the summary judgment issues.

## II.

Turning to the substantive issues, DSM first argues that the District Court improperly granted the Defendants' motion for summary judgment with respect to the first count of the complaint, which alleged that the Defendants tied a free first telephone yellow pages listing to the subscription of new business telephone service re-

sulting in a *per se* violation of section 1 of the Sherman Act. Section 1 provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1.

DSM contends that Ohio Bell requires business telephone subscribers to accept a free yellow pages listing. Although DSM concedes that the customer may refuse the listing, DSM argues that since the price of telephone service is not reduced if the customer refuses the listing, the customer always has to pay for the listing whether listed or not.

Defendants argue that no tying arrangement exists because the customer does not purchase the free listing. In response to DSM's "hidden charge" argument, the Defendants point out that the evidence shows that the only expenses of API that Ohio Bell pays for are the costs of printing the white pages.

The District Court held that there was no genuine issue of material fact as to whether a tying arrangement existed. The Defendants had put forth evidence showing that Ohio Bell has never sold a first listing or derived revenue from it; DSM failed to respond with contradictory evidence. Consequently, the District Court granted Defendants' motion for summary judgment as to the first count.

We recently set forth the elements of an illegal tying arrangement in *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir.1983): "1) There must be a tying arrangement between two distinct products or services; 2) The seller must have sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and 3) The amount of commerce affect[ed] must be 'not insubstantial.'" *Id.* at 1330. In *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) the Supreme Court stated that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the *purchase* of a tied product that the

buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 12, 104 S.Ct. at 1558 (emphasis added). The Court added that *per se* prohibition of a tying arrangement is appropriate where antitrust forcing is likely, for example where the seller has a monopoly in the market of the tying product. *Id.* at 16, 104 S.Ct. at 1560. In this case Ohio Bell appears to have a monopoly in the market of the tying product, business telephone service. The question is whether purchasers of business telephone service are forced to purchase a first listing in API's yellow pages. It is clear that they do not pay for it directly, and that they do not have to be listed if they do not wish to be. An illegal tying arrangement may exist, however, if Ohio Bell in some way charges for the first listing in its bill for telephone service whether or not the customer accepts the listing.

The Defendants have put forth evidence that Ohio Bell does not charge for the listing, and that it does not pay API for the costs API incurs in supplying the customers with the first listing. The PSC clearly requires API to "[m]ake every reasonable effort to provide *without charge* in at least one of the Yellow Pages Directories each year, one light-face or regular listing representing the primary Yellow Pages listing of each [business telephone] subscriber." Joint Appendix at 412 (emphasis added). Furthermore, the PSC states that, other than the costs API incurs in association with the white pages, "[Ohio Bell] will not be responsible for any cost or expense incurred by [API] in the performance of the services rendered by [API] pursuant to this Agreement." Joint Appendix at 418. No hidden charge for the free first listing can be inferred from this evidence, and DSM does not offer any contradictory evidence.

If Ohio Bell does not receive a financial benefit from the tied product, case law indicates that a tying arrangement does not exist. In *Rickards v. Canine Eye Registration Foundation, Inc.*, 704 F.2d 1449 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed. 2d 683 (1983) CERF, a non-profit charitable organization, published a registry listing purebred dogs of breeds that were susceptible to hereditary eye diseases. CERF required dogs to be examined by certified vets, who used evaluation forms that CERF provided. The plaintiffs were non-certified vets. They alleged that CERF illegally tied the issuance of a registration certificate to the use of a CERF form and service by a certified vet. The court held that no tying arrangement existed, stating that "[i]n examining a tie-in claim, this Court must consider whether the seller of the tying product (the CERF certificate) harbors an economic interest in the tied product (the use of the CERF examination form and the performance of services by [a certified vet]). The CERF examination forms were provided to the veterinarians free of charge. The fee charged by the veterinarians did not benefit CERF in any way." *Id.* at 1454–55 (citations omitted). The court affirmed the grant of the defendant's motion to dismiss. *See also Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Sys., Inc.*, 732 F.2d 1403 (9th Cir.1984) (no illegal tying arrangement where seller of tied product did not have a sufficient economic interest in the tied product, which was provided by another seller).

◼ We are persuaded that the District Court correctly granted the Defendants' motion for summary judgment as to the claim of a *per se* illegal tying arrangement. All the evidence indicates that no hidden charge exists for the first listing. If Ohio Bell does not charge for the first listing, and does not have an economic interest in the first listing, then no tying arrangement exists because there is no purchase of a tied product.

### III.

DSM also argues that the District Court improperly granted Defendants' motion for summary judgment with respect to the second count of the complaint, which alleged that Ameritech and Ohio Bell used their monopoly position in the telephone business to restrain competition in the yellow pages business in violation of section one's Rule of Reason. DSM points in particular to

four practices of the Defendants that it alleges illustrate their use of monopoly power: 1) the free first listing in the yellow pages; 2) Ohio Bell's practice of billing customers for yellow pages charges when billing for telephone service; 3) Ohio Bell's alleged practice of terminating the phone service of customers who have not paid their yellow pages bill; and 4) the delivery of yellow pages at the time Ohio Bell installs telephone service.

The Defendants argue first, that no violation of section 1 exists because DSM has falled to allege a contract, combination or conspiracy, and second, that since the first yellow pages listing is not purchased, Ohio Bell has not leveraged its position in the telephone market to restrain competition in the yellow pages market.

■ The District Court found that DSM failed to allege a contract, combination or conspiracy as required by section 1. Since the first listing is not tied to the purchase of telephone service, the agreement between Ohio Bell and its customers would not support a claim of restraint of trade in the yellow pages market. The PSC, which is a contract between Ohio Bell and API, both subsidiaries of Ameritech, did not qualify because under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) subsidiaries are not separate enterprises for the purposes of section 1.

■ Under section 1, a contract, combination or conspiracy that unreasonably restrains trade by leveraging a seller's monopoly power in one market into another market is illegal, *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 506 (6th Cir.1983). *White* compared leveraging with tying: "The only difference between 'tying' and 'leveraging' is that a tie-in requires proof that the second (or tied) item is forced upon the buyer as a 'condition' of the original sale, whereas leverage does not involve such an overt, coercive link." *Id.*

■ The initial question here is whether DSM has alleged a contract, combination or conspiracy. Agreements obviously exist between telephone customers and Ohio Bell. However, there is no evidence that this agreement involves anything other than telephone service. The Defendants, as noted in the previous section, have shown that the free listing is not forced upon the customer and that neither Ohio Bell nor API charges for the first listing. There is no evidence that the agreement between Ohio Bell and its customers requires Ohio Bell to provide a free listing to the customer; Ohio Bell is not even in the business of yellow pages. Consequently, the agreements with customers appear to have no connection to the yellow pages market and will not support a leveraging claim under section 1.

■ An extensive contract exists between Ohio Bell and API, the PSC. We agree with the District Court that it probably does not qualify as a contract, combination or conspiracy for the purposes of section 1. *Copperweld* held that a parent cannot combine with its wholly-owned subsidiary for the purposes of section 1 because they are not separate enterprises. 467 U.S. at 768, 104 S.Ct. at 2740. Here we have two subsidiaries which are wholly-owned by the same parent and are likewise not separate enterprises. We agree with the Fifth Circuit that *Copperweld* precludes a finding that two wholly-owned sibling corporations can combine for the purposes of section 1. *See, e.g., Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir.1984) (reasoning that if two siblings cannot conspire with their parent in violation of section 1, they cannot conspire with each other); *Century Oil Tool, Inc. v. Production Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir.1984). DSM's claim under the second count fails because it has failed to allege a contract, combination or conspiracy.

### IV.

Finally, DSM argues that the District Court improperly granted the Defendants' motion for summary judgment as to the third count, which alleges that the Defendants have conspired to monopolize and have monopolized the yellow pages market in

the Cleveland area in violation of section 2. Under section 2 the elements of monopolization are: 1) the possession of monopoly power in the relevant market; and 2) the willful acquisition, maintenance, or use of that power either by anticompetitive or exclusionary means. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595, 105 S.Ct. 2847, 2854, 86 L.Ed.2d 467 (1985). DSM alleged in its complaint that the Defendants have a ninety-percent share of the relevant product and geographic markets, which DSM alleged to be the yellow pages and the Cleveland area. DSM puts forth ten different forms of anticompetitive, exclusionary conduct by the Defendants. We will address only the three chief practices alleged by DSM.[2] First, DSM alleges that Ohio Bell and API deny other yellow pages publishers access to essential facilities. Second, DSM alleges that Ohio Bell and API engage in predatory pricing when they give away a free listing. Third, DSM alleges that the Defendants try to confuse the public into believing that the yellow pages are part of their state-chartered monopoly.

*Essential Facilities*

■ The refusal to give competitors reasonable access to an essential facility is a form of anticompetitive behavior that will support a claim of monopolization. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 375, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973). "The essential facility doctrine, also called the 'bottleneck principle,' states that 'where facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility.'" *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992 (D.C. Cir.1977) (quoting A.D. Neale, The Antitrust Laws of the United States 67 (2d ed. 1970)), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). "To be 'essential' a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if de-

nial of its use inflicts a severe handicap on potential market entrants." *Hecht*, 570 F.2d at 992.

DSM identifies three facilities that it argues are essential: 1) the delivery of API's yellow pages with the white pages; 2) Ohio Bell's billing of yellow pages listings and advertisements on telephone bills; and 3) Ohio Bell's provision of daily information of telephone customers' business classifications, obtained when a customer orders telephone service. The Defendants argue that none of these is an essential facility because DSM could duplicate them if it so wished or because they are not competitive advantages. The District Court held as to the simultaneous delivery that simultaneous delivery was not necessary in order for a yellow pages company to be successful, and that furthermore, API could duplicate the practice. As to the billing service, the court found that API could bill less expensively through other companies than through Ohio Bell, reducing significantly the competitive advantage. Although the court found that API benefitted from the practice because its customers are more likely to pay on time when Ohio Bell bills for yellow pages with telephone service, that benefit was insufficient to convert the practice into an essential facility. As to Ohio Bell's providing API with new subscriber lists that included a business classification, the court found that Ohio Bell provided the lists at a lower cost to other companies than to API. Although Ohio Bell would not provide other companies with the business classification, the court found that since the information was so unreliable that API had to contact each subscriber individually to determine its proper business classification, it was not a competitive advantage, and consequently not an essential facility.

■ We agree with the District Court that the Defendants have demonstrated that there is no genuine issue of material fact as to whether they control an essential

---

**2.** We see no need to discuss the remaining seven practices which were appropriately analysed and rejected by the District Court.

facility. Although David Clemons testified that there was some advantage to having the yellow pages and the white pages delivered simultaneously, he also testified that other yellow pages competitors have been able to arrange to deliver their yellow pages constantly throughout the year, and that it is possible for them to arrange simultaneous delivery. DSM has not put forth any contradictory evidence. It is uncontroverted that although Ohio Bell conducts the billing for API, charging customers for their yellow pages listing at the same time as it charges for telephone service, the annual fee which API pays to Ohio Bell under the PSC far exceeds the costs of the services that Ohio Bell provides to API. Finally, although Ohio Bell provides API with lists of new telephone subscribers, it sells the lists to other companies at a lower cost than it sells them to API. Consequently, even if this service was an essential facility, the essential facility doctrine would not apply because the Defendants provide reasonable access to it. Although Ohio Bell will not provide the business type of its subscribers to companies other than API, the uncontroverted evidence is that the provision of the business classification is not a competitive advantage to API. Since the information is so unreliable, API must contact each subscriber to determine the correct business classification. Since any competitor could easily do the same thing, the service is not an essential facility.

### Predatory Pricing

DSM also claims that the Defendants are engaging in predatory pricing, a form of exclusionary conduct that will support a claim for monopolization. *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1055 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984). DSM argues that the free yellow pages listing constitutes a giveaway below cost and is intended to be a barrier to entry. The Defendants argue that the free listing is merely a promotion, and that the free listing cannot qualify as predatory pricing because the Defendants do not compete in the sale of first yellow pages listings. DSM responds by arguing that promotional devices can be predatorily priced, citing III Areeda & Turner, *Antitrust Law* 176 (1978 & Supp.1982), which states that promotional pricing is not a defense when a monopolist is charged with predation. The District Court held that the free first listing was not a predatorily priced product, reasoning that API produced evidence that it has never sold first listings, and consequently the Defendants do not compete in the sale of first listings.[3]

■ Predatory pricing requires that the Defendants sell a product at a price below cost. DSM has not put forth any evidence that the Defendants are selling anything other than the first listing at a price below cost, so the issue is limited to the free first listing. The fallacy in DSM's argument is that the Defendants do not sell first listings, they sell subsequent listings. Their policy of providing the first listing free does not meet Areeda's & Turner's definition of a promotional price: "A promotional price is a temporary, low price designed to induce patronage with the expectation that the customer will continue purchasing the product in the future at a higher price." Areeda & Turner, *supra*. Since the Defendants never sell the items they are giving away, first listings, they clearly are not giving them away with the expectation that customers will continue buying first list-

---

**3.** The Sixth Circuit has adopted the Ninth Circuit's version of the Areeda and Turner rule. *See* Areeda & Turner, *Predatory Pricing & Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). In *Arthur S. Langenderfer* the court described the rule as follows:

"If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the

plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors."
729 F.2d at 1056 (quoting *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)).

ings in the future at a higher price. We are persuaded that the first listing is not a separate product or market for the purposes of predatory pricing, and that to demonstrate predatory pricing DSM would have to show that the Defendants' overall charges for advertising space in their yellow pages are priced below cost.

This reasoning is in accord with *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48 (2d Cir.1979). In that case one of the town's two newspapers decided to start publishing a Sunday edition of its paper in addition to the other six weekly editions. To promote the new edition, for five weeks the newspaper offered all seven editions at the same price per week as they had previously offered the six editions. The other newspaper challenged the promotion as predatory, arguing that the extra edition was being offered free, below cost. The court held that the promotion was not predatory because the plaintiffs had failed to show that the promotion would produce even a short-term loss for the promoting newspaper's operations *taken as a whole. Id.* at 55. Similarly, in the case before this Court, the relevant area of inquiry should be API's operations taken as a whole. We point out that DSM, in its complaint, alleged that the relevant product market was the yellow pages market, not the first listings market.

*Intentional Misleading*

DSM claims that Ohio Bell intentionally misleads the public into believing that the yellow pages it publishes are part of its telephone monopoly and therefore are the "official" yellow pages. This claim has little merit. Since Ohio Bell and API are both wholly-owned subsidiaries of Ameritech, they are related and, as the District Court held, "it would be illogical to infer that the defendants *mislead* the public by revealing the truth of their shared identity." Joint Appendix at 39. Although DSM alleged that the Defendants cause the public to believe that the market for advertising in classified business telephone directories is part of the state sanctioned monopoly of providing telephone service, the Defendants have supplied evidence that they do not in fact do that. DSM has not come forward with any contradictory evidence. Consequently, we agree with the District Court that this claim does not support a finding that the Defendants are engaging in anticompetitive behavior, and that summary judgment as to DSM's claim of monopolization was appropriate.

Accordingly, we AFFIRM the judgment of the District Court.