**Daniel R. HORST, Jacqueline S. Horst and Daniel R. Horst, Trustee, Plaintiffs,**

v.

**LAIDLAW WASTE SYSTEMS, INC., and Laidlaw Waste Systems (Colorado), Inc., f/k/a GSX Denver Regional Landfill, Inc., Defendants.**

**Civil Action No. 94–D–1525.**

United States District Court, D. Colorado.

Feb. 28, 1996.

Lance F. Astrella, Thomas R. Rice, Astrella & Rice, P.C., Denver, CO, for Plaintiffs.

Gale T. Miller, Davis, Graham & Stubbs, Denver, CO, Lawrence W. Treece, John D. Fognani, Margaret B. Graham, Gibson, Dunn & Crutcher, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

DANIEL, District Judge.

### I. INTRODUCTION

This is an antitrust case wherein Plaintiffs ("Horsts") assert three claims under sections one and two of the Sherman Act, 15 U.S.C. § 1, 2. The underlying dispute centers around a piece of real property in Erie, Colorado which was subject to a purchase option agreement between the Horsts and Defendant Laidlaw Waste Systems (Colorado) Inc. ("Laidlaw Colorado"), a waste disposal company. The Horsts claim that subject to the parties' option agreement, they tendered the land to Laidlaw Colorado after receiving the necessary permits from the Colorado Department of Health to operate a landfill. The Horsts further claim that after Laidlaw Colorado failed to exercise its purchase option, it refused to provide them with a quit claim deed as required under the terms of the parties' option agreement. As a result, the Horsts commenced a Colorado state court breach of contract action in the District Court, County of Weld, in the Spring of 1992. Complaint ¶ 12. During the course

of discovery in that action, the Horsts uncovered materials which they believe give rise to the antitrust claims now asserted in this action. *Id.* at ¶ 13.

In this proceeding, the Horsts maintain that Defendant Laidlaw Colorado and Defendant Laidlaw Waste Systems, Inc. ("Laidlaw Delaware")—two related corporate entities—conspired in an effort to restrain trade and monopolize the relevant market as it pertains to solid waste landfills. Complaint ¶¶ 15–18. In support of their claims, the Horsts attached to their complaint a memorandum written by an executive of Laidlaw Delaware to an executive of Laidlaw Colorado which "reflects a plan and scheme on the part of defendants to deprive both plaintiffs and the defendants' competitors of the ability to market, develop, and utilize both parcels 1 and 2 as a landfill or landfills." Complaint ¶ 13. In essence, the Horsts claim that by not releasing the quit claim deed, the Defendants (collectively referred to as "Laidlaw") have effectively, and purposefully, tied up the land in an effort to restrain trade and monopolize the relevant market as it pertains to solid waste landfills.

## II. DISCUSSION

Laidlaw has filed three separate motions. They are: (1) Motion for Partial Summary Judgment, on August 8, 1994; (2) Motion to Dismiss, on August 8, 1994; and (3) Second Motion for Summary Judgment, on October 31, 1995.

### A. Motion for Partial Summary Judgment [1]

Plaintiffs first and second claims for relief assert that Laidlaw Colorado and Laidlaw Delaware engaged in a conspiracy. *See* Complaint ¶¶ 15, 17. However, relying on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and its progeny, Laidlaw asserts that its entities are incapable of conspiring under the Sherman Act as a matter

of law since they are related corporate entities. Accordingly, Laidlaw argues that the Horsts' first and second claims of relief—both of which allege a conspiracy between Laidlaw Colorado and Laidlaw Delaware—should be dismissed. I agree.

In *Copperweld*, the Supreme Court held that a parent corporation and its wholly-owned subsidiaries are legally incapable of conspiring with each other in violation of Section One of the Sherman Act. *Id.* at 771, 104 S.Ct. at 2741–42. The court reasoned that "[i]f antitrust liability turned on the garb in which a corporate subunit was cloaked, parent corporations would be encouraged to convert subsidiaries into unincorporated divisions, ... [which] serves no valid antitrust goals but [instead] merely deprive[s] consumers and producers of the benefits that the subsidiary form may yield." *Id.* at 773–774, 104 S.Ct. at 2743.

Turning to the facts of this case, Defendants have submitted affidavits and other evidence indicating that Laidlaw Colorado is a wholly-owned subsidiary of Laidlaw Waste System Holdings, Inc., which in turn is a wholly-owned subsidiary of Laidlaw Delaware. Thus, the evidence demonstrates that Laidlaw Delaware and Laidlaw Colorado occupy a grandparent-grandchild subsidiary relationship. The Horsts respond with two arguments: (1) *Copperweld* is limited to the narrow instance of a parent and wholly owned subsidiary relationship, not a grandparent and grandchild; and (2) there is a question of fact as to whether Laidlaw Colorado and Laidlaw Delaware are sister corporations or, as Defendants claim, grandparent-grandchild corporations.

■ However, even assuming *arguendo* that Laidlaw Delaware and Laidlaw Colorado are sister corporations rather than grandparent-grandchild corporations, Plaintiffs' conspiracy claims still fail under *Copperweld*. As Judge Arraj of this Court once explained, "[a]lthough the [*Copperweld*] holding does

---

1. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Also, in reviewing a Rule 56(c) motion, all factual disputes and inferences must be drawn in favor of the Horsts, the nonmoving party. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980).

not explicitly preclude allegations of a conspiracy between two sister corporations, such as [the case here], the Court's rationale does apply to such situations." *H.R.M., Inc. v. Tele–Communications, Inc.,* 653 F.Supp. 645, 647–48 (D.Colo.1987); *see also Hood v. Tenneco Texas Life Ins. Co.,* 739 F.2d 1012, 1015 (5th Cir.1984); *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 643 F.Supp. 449, 451 (D.Del.1986); *Carl Hizel & Sons, Inc. v. Browning–Ferris Indus., Inc.,* 590 F.Supp. 1201, 1202 n. 2 (D.Colo.1984) (J. Kane). Simply stated, federal courts have consistently applied *Copperweld* to preclude the finding of antitrust conspiracies within a corporate family such as the case now presented. *See, e.g., Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 611 (6th Cir.1987); *Century Oil Tool, Inc. v. Production Specialties, Inc.,* 737 F.2d 1316, 1317 (5th Cir.1984) ("Given *Copperweld,* we see no relevant difference between a corporation wholly owned by another corporation, two corporations wholly owned by a third corporation or two corporations wholly owned by three persons who together manage all affairs of the two corporations."). Thus, whether Defendants are sister corporations or one is the wholly-owned "grandchild" of the other, they are incapable of conspiring under the Sherman Act. Accordingly, Horsts' first and second claims for relief must be DISMISSED since they are premised on a conspiracy between Laidlaw Colorado and Laidlaw Delaware, two related corporate entities. *See H.R.M.,* 653 F.Supp. at 648 ("Plaintiff's conspiracy claim under section 2 of the Sherman Act is also foreclosed by the rationale of *Copperweld.*").

### B. *Second Motion for Summary Judgment*

■ In their Second Motion for Summary Judgment, Defendants argue that (1) summary judgment should be granted on all three of Plaintiffs' claims for lack of the requisite "substantial effect on interstate commerce;" and (2) summary judgment should be granted on Plaintiffs' third claim for relief—attempted monopolization—because there is no dangerous probability of success in monopolizing the relevant market. As for Defendants first argument—lack of

nexus with interstate commerce—it is rejected under the relaxed standard enunciated in *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), since the activities in question (waste disposal) may arguably have an impact on interstate commerce.

■ Turning to Defendants' second argument—that the Horsts' attempted monopolization claim must be dismissed since there was no "dangerous probability of success"—it is clear that

> [i]n this circuit, four elements must be proven to establish an attempt to monopolize under Section 2 of the Sherman Act: (1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt.

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.,* 885 F.2d 683, 693 (10th Cir. 1989), *cert. denied,* 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990). For purposes of summary judgment, Laidlaw concedes that the Horsts have satisfied elements three and four. However, Laidlaw contends that the Horsts' attempted monopolization claim must fail since the evidence indicates that Laidlaw had no dangerous probability of success in monopolizing the relevant market. Courts insist that such a showing be made because otherwise the Sherman Act could unwittingly be expanded into an unfair competition statute. *Id.* at 693 n. 17; *see also Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993) ("For these reasons, § 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so.").

"In order to satisfy the dangerous probability of success element of an attempt claim, the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as a result of the predatory conduct alleged by the plaintiff." *Colorado Interstate,* 885 F.2d at 693. The likelihood of successful monopolization is typ-

ically evaluated by examining the defendant's share of the relevant market. *Id.* at 694; *see also Spectrum,* 506 U.S. at 456, 113 S.Ct. at 891 ("In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."). As stated above, the "relevant market" encompasses two markets: the "product market" and the "geographic market." *See, e.g., Rural Tel. Serv. Co. v. Feist Publications, Inc.,* 957 F.2d 765, 768 n. 2 (10th Cir.), *cert. denied,* 506 U.S. 984, 113 S.Ct. 490, 121 L.Ed.2d 429 (1992). In this instance, both parties agree that the relevant product market consists of landfills capable of accepting solid waste for disposal. However, the parties disagree as to what constitutes the relevant geographic market.

■ A relevant geographic market consists of the area of effective competition in which sellers operate and to which buyers can practically turn for purchases. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627–28, 5 L.Ed.2d 580 (1961); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 893 (10th Cir.1991). Here, Laidlaw urges that the relevant geographic market is the Denver metropolitan area, which in 1991 principally consisted of four landfills operated by three companies, as described below: [2]

| Company | 1991 | Market Share 1992 | 1993 | 1994 |
|---|---|---|---|---|
| Laidlaw | 34% | 24% | 22% | 24% |
| BFI (2 landfills) | 27% | 40% | 48% | 31% |
| WMI | 35% | 33% | 30% | 46% |

Plaintiffs' economic expert, Dennis E. Peseau, Ph.D., originally agreed with this geographic market definition. As Dr. Peseau stated in his March 15, 1995 report, "four landfills service the geographic market, which are owned and/or operated by three entities: Laidlaw, Waste Management, Inc.

**2.** As Defendants' expert economist, George F. Rhodes, Ph.D., states:

[T]he relevant geographic market including the Laidlaw landfill and the Horst property consists of the geographic areas served by the haulers using the BFI landfills at Tower Road and RPS, the transfer station owned and operated by Waste Management (WMX) in Com-

("WMI") and Browning–Ferris Industries ("BFI")." Peseau Report at 1. Furthermore, his market share figures for 1991 are essentially identical with those compiled by Defendants' expert, which are highlighted above. *Id.* at 2. However, in a supplemental letter dated May 31, 1995, Dr. Peseau modified his opinion, concluding that the relevant geographic market is narrower. Specifically, he opined that the WMI landfill in Commerce City is not part of the relevant geographic market. Under his amended report, the geographic market as it relates to Laidlaw breaks down as follows:

Laidlaw Colorado's Market Share (%)

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| Relevant Market [3] (3 landfills/2 Cos.) | 55–59% | 36–41% | 31–37% | 44–53% |
| vs. | | | | |
| Greater Market [4] (4 landfills/3 Cos.) | 36% | 24% | 22% | 24% |

Exhibit C of Peseau letter, May 31, 1995.

Although there is a factual difference between the parties' experts about the correct geographic market definition, such difference does not preclude me from granting summary judgment in this case. Plaintiffs' expert's definition of the relevant geographic market need not be automatically accepted for purposes of summary judgment since "[i]n the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict." *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1435–36 (9th Cir.1995). As the Supreme Court has explained:

When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.

merce City together with the landfills serving it.
Rhodes Report, April 13, 1995, at 2; *see also id.* at 12–15.

**3.** Excludes WMI landfill at Commerce City.

**4.** Includes WMI landfill at Commerce City.

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242–43, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993); *see also SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 968–69 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995).

Based on the underlying market realities and economic data presented by the parties, I find, as a matter of law, that the relevant geographic market is the greater metropolitan Denver area which consists of four landfills operated by three companies. This is consistent with both experts' original reports. More importantly, the record indicates that the waste from each of the four operating landfills comes from the entire Denver metropolitan area and outlying suburbs, and the Horsts' landfill, if placed in operation, would serve the same area, plus a few Colorado towns to the north. Each of the three companies has its own hauling operations which pick up waste throughout the Denver metro area. Also, the record discloses that there is price competition among the four landfills operated by these companies in the Denver area and that customers within the area can use any of the three companies. Furthermore, the Horsts' own exhibits and internal documents support the conclusion that the relevant geographic market consists of four landfills.[5] Finally, both the deposition testimonies of Dan Horst and his expert reveal that the four landfills were sensitive to price changes charged by one another, a signal that they are part of the same geographic market. Daniel R. Horst Deposition, April 26, 1995, at 77–78; Peseau Deposition, May 11, 1995, at 103. *See United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 400, 76 S.Ct. 994, 1009–10, 100 L.Ed. 1264 (1956); U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* at 16 (1992). Thus, notwithstanding Plaintiffs' expert's amended opinion to the contrary, the underlying facts, data, and reports demonstrate that the relevant geographic market is the Denver metropolitan area which consists of four landfills operated by three companies.[6]

█ Having established the relevant market—that is, the relevant product market *and* geographic market—I must now analyze Laidlaw's market share during the time of its alleged attempted monopolization to determine whether there was any "dangerous probability of success in monopolizing the relevant market." *Colorado Interstate*, 885 F.2d at 693. In this instance, the relevant time period for analysis commences in late 1991, since it was at that time that the Horsts first offered the land in question to Laidlaw Colorado for purchase under the parties' option contract. *See* Complaint ¶¶ 10–11. Since Plaintiffs did not tender the land to Laidlaw Colorado until late 1991 or early 1992, Defendants alleged attempted monopolization could not have occurred before then. *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 63 F.3d 1540, 1554 (10th Cir.1995); *Colorado Interstate*, 885 F.2d at 695 n. 20.

As noted above, Laidlaw's market share was 34% in 1991, 24% in 1992, 22% in 1993, and 24% in 1994. Thus, before Laidlaw's alleged attempted monopolization, its share of the market was 34%, while during and after its purported attempted monopolization its market share *decreased* by approximately 10%. For this reason, the evidence shows that there was no "dangerous probability of success in monopolizing the relevant market." As the court stated in *Colorado Interstate*, "There was simply no reasonable chance, let alone a dangerous probability,

---

5. Plaintiffs' Exhibit A states that "[t]here are currently four MSW [municipal sanitary waste] landfills serving the market: 2 owned by BFI, one by LWS [Laidlaw] and one controlled by WMI." Although the document also refers to the "northern Denver metropolitan market," the description of this market includes the City and County of Denver and the entire 1.9 million person population of the Denver metropolitan area. *See also* Daniel R. Horst Deposition, April 26, 1995, at 28–29 (the waste deposited in each of the four operating landfills "comes from the entire Denver Metropolitan area and the outlying suburbs").

6. Note, even if I were to accept for purposes of summary judgment Dr. Peseau's amended opinion that the relevant market excludes WMI, my ultimate conclusion that Defendants had no dangerous probability of obtaining monopoly power would not change. *See* note 7, *infra*.

that [Laidlaw], through the [purported breach] of its contractual [responsibilities], could imbue [itself] with sufficient market share to be a monopolist." *Id.* at 695. Although courts are often reluctant to apply hard and fast tests when faced with whether a particular market share is sufficient to advance a Sherman Act claim, *see, e.g., Rebel Oil,* 51 F.3d at 1437–38, here I find, as a matter of law, that there is no probability of success in monopolizing the relevant market since Laidlaw's market share actually decreased during the relevant time period.[7] *See Colorado Interstate,* 885 F.2d at 693–94.

Finally, without detailing all of the record evidence, I additionally note that other relevant factors—i.e. market trends, entry barriers, persistence of a firm's ability to profitably charge monopoly prices—indicate that there was no "dangerous probability of success in monopolizing the relevant market." *See Legal Studies,* 63 F.3d at 1554–56; *Colorado Interstate,* 885 F.2d at 695–96. In *Legal Studies,* the Tenth Circuit reversed the trial court's grant of summary judgment because the "evidence of the Defendants' market share and resources, the nature of the competition they face, and the barriers to entry in the … market, are sufficient to create a material factual dispute with regard to dangerous probability of success." 63 F.3d at 1555–56. *Legal Studies,* however, is clearly distinguishable from the facts presented in this action. Here the evidence indicates that Laidlaw's market share decreased during the relevant period, whereas in *Legal Studies* the Defendants' market share increased from less than 2 percent to more than 70 percent during the relevant period. *Id.* at 1554–55. Similarly, unlike in *Legal Studies,* the underlying record in this case indicates that competition in the waste disposal business, as reflected by price sensitivity and excess capacity, was fierce and that entry barriers, though real, have not precluded new entrants from entering the waste disposal market. Accordingly, even when the evidence is viewed in the light most favorable to the Horsts, as required, the

evidence leads to but one inescapable conclusion: Defendants lacked a dangerous probability of success of obtaining monopoly power in the waste disposal business.

In holding that Plaintiffs' attempted monopolization claim is deficient as a matter of law, I conclude that the Sherman Act is not a legally viable avenue for the Horsts to seek redress for Laidlaw's allegedly wrongful conduct. As the Tenth Circuit has stated:

> This analysis, which requires plaintiff to show that an attempted monopolist's conduct threatened to create substantial and persistent changes in the marketplace, may allow some unfair and potentially harmful methods of competition to go unpunished by the antitrust laws. But the Supreme Court, in a now oft quoted phrase, has stated "the antitrust laws … were enacted for 'the protection of competition not competitors.'" The Court has long recognized that the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." … Since there was no dangerous probability that [Laidlaw] would [gain] the degree of market power, either in terms of market share or persistence, necessary for the monopolization offense, [plaintiffs' claim must be dismissed].

*Colorado Interstate,* 885 F.2d at 697 (footnote and internal citations omitted). Consequently, I believe that Plaintiffs' parallel state court proceeding is the proper province for the resolution of this contract dispute.

### III. *CONCLUSION*

Accordingly, for the reasons discussed above, it is hereby

ORDERED that Defendants' Motion for Partial Summary Judgment and Second Motion for Summary Judgment are hereby GRANTED. Therefore, Plaintiffs' first and second claims for relief which assert that Laidlaw Colorado and Laidlaw Delaware engaged in a conspiracy are DISMISSED. It is further

---

7. Similarly, even if the Court were to use the narrower, three-landfill relevant market advanced by plaintiffs, plaintiffs' own numbers indicate that Laidlaw's market share declined from 55–59% in 1991 to 36–41% in 1992, or approximately one-third. *See* Exhibit C of Peseau letter, May 31, 1995.

ORDERED that Plaintiffs' third claim for relief—attempted monopolization under Section 2 of the Sherman Act—is DISMISSED.[8]

---

**8.** Given this disposition, the Court need not consider Defendants' Motion to Dismiss, wherein Defendants assert that Plaintiffs' complaint suffers from numerous pleading defects.