MOORE, Circuit Judge,
concurring in the judgment.
While I agree with the majority’s holding, I write separately to express my own views on this complicated case.
I. ANTITRUST LAW
Any court reviewing a claim brought under § 2 of the Sherman Act, 15 U.S.C. § 2, must be especially mindful of the fine line between illegal predation and healthy competition. As the Supreme Court has stated, “[i]t would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.” Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 226-27, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Thus, successful predation claims are limited to the rare instance in which an incumbent seeks to retain monopolist control in the future by ceasing to engage in economically rational behavior in the present in an effort to drive potential rivals from the market. Predation is not proven merely through the absence of profit maximization but rather through the absence of profitability itself in the relevant market. See MCI Communications Corp. v. AT & T Co., 708 F.2d 1081, 1114 (7th Cir.) (holding that imposing a profit-maximization rule as the standard for liability “would tend to freeze the prices of dominant firms at their monopoly levels and would prevent many pro-competitive price cuts beneficial to consumers”), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Therefore, only when predatory prices are set below an appropriate measure of costs will liability be imposed.
Additionally, to establish a predatory-pricing claim, a plaintiff must demonstrate that following the predation period, the incumbent has “a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices.” Brooke Group, 509 U.S. at 224, 113 S.Ct. 2578. As the Court has noted, “[rjecoupment is the ultimate object of an unlawful predatory-pricing scheme; it is the means by which a *954 predator profits from predation.” Id. Put another way, recoupment is the return to monopolist control which is at the heart of the incumbent’s anti-competitive behavior. Having established the two requirements for proving a predatory-pricing claim under § 2 of the Sherman Act, I turn to the claims presented in this case.
II. THE AIRLINE INDUSTRY
Applying the theoretical principles outlined above to the reality of the airline industry presents a challenging task. Inquiring into whether Northwest Airlines, Inc. (“Northwest”) charged prices below an appropriate measure of costs implicates several peculiarities of the airline industry. Professors Areeda and Turner, the first commentators to propose a specific cost-based standard for predatory pricing, argued that pricing below short-term marginal cost should be deemed unlawful. Phillip Areeda & Donald F. Turner, Predatory Pricing & Related Practices under Section 2 of the Sherman Act, 88 Harv. L.Rev. 697, 712 (1975). Given the real-world difficulty in ascertaining a firm’s marginal cost, however, Professors Areeda and Turner suggested using a firm’s average variable cost, defined as total variable costs divided by total units produced, as a proxy for marginal cost. Id. at 700, 716. Thus, in a traditional industry, if a manufacturer prices its product, a widget, below the average variable cost of producing widgets, the Areeda-Turner model would find the price to be predatory.
Unlike a traditional manufacturer, however, the airline industry presents a more complicated scenario because the bulk of its variable costs are common costs shared among all passengers on a flight. Once an airline commits to flying a plane along a specific route, the airline must incur the costs of the pilots, flight attendants, fuel to fly the empty plane, ownership of the plane, and servicing, without regard to the actual number of passengers on the plane. Despite the common nature of these costs, they are still treated as variable costs of the route because the airline could avoid incurring all of them by exiting the route and redeploying the plane to an alternative route. In addition to these common-variable costs, the airline incurs incremental costs for each additional passenger added on the plane. These passenger-variable costs include the costs associated with processing the ticket, beverage and food service (if any), incremental fuel required to carry the passenger, and baggage service. Thus, the passenger-variable costs are quite minimal compared to the common-variable costs, or non-passenger variable costs of the route. This disproportional nature between the passenger-variable costs and the common-variable costs has significant implications with regard to evaluating a predatory-pricing claim. For example, suppose on a given route the common-variable costs were $1,000 and the passenger-variable costs were $10 per passenger, and only two passengers were flown, the total variable costs would be approximately $1,020, and the average variable cost would be $510. A fare charged below that amount would be considered predatory pricing under the Areeda-Tur-ner analysis. With each additional passenger added to the plane, however, the average variable cost declines because the common-variable costs are the bulk of the airline’s expense and the incremental cost of each additional passenger is so minimal. Thus, if twenty passengers flew on the plane, the total variable costs would be approximately $1,200, and the average variable cost would be $60. Thus, in this scenario, under the Areeda-Turner model, a fare must be below $60 to be considered predatory.
*955 The analysis of the airline market takes on an additional level of complexity when price discrimination is taken into account. Anyone who has ever flown on short notice can attest to the fact that similar seats on the same plane are not priced identically. Indeed, once an airline has committed to flying a plane on a certain route and the common-variable costs have already been incurred, it is in the airline’s interest to fill the capacity on the plane given the fact that the incremental cost of each additional passenger is so low and each passenger further reduces the average variable cost. Thus, airlines often sell deeply discounted fares to utilize the unused seats. As Professors Areeda and Hovenkamp have stated, “[i]n the airplane case the seat is going out anyway, full or empty, and any price above the cost of serving the additional passenger will make the additional sale profitable.” Ill Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 742c, at 466 (2d ed.2002). The question before a court in evaluating an antitrust claim becomes whether predatory pricing should be evaluated based on each individual fare or on a larger route-wide basis. For example, under the scenario laid out above, if ten passengers paid a fare of $120 each and thereby covered the total variable costs, while the remaining ten passengers paid a discounted fare of $50 each, the route itself would be profitable, generating $500 more than the total variable costs. The $50 discounted fare, however, would be below the average variable cost, and therefore, the question before the court would be whether pricing on that fare should be considered predatory. This is precisely the issue at the heart of Spirit Airlines, Inc. (“Spirit”)’s § 2 claim against Northwest.
The Eighth Circuit has rejected such a narrow fare-specific approach, holding that it is “necessary to consider not just [an airline’s] lowest prices, but all of its prices for the routes involved, for that is the only basis upon which the relationship between [the airline’s] charges and costs could be determined.” Int’l Travel Arrangers v. NWA Inc., 991 F.2d 1389, 1396 (8th Cir. 1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 309 (1993). In this court, we have not addressed this issue of whether the broader airline-passenger market could be further segmented into other fare-specific markets or instead whether the overall route profitability is the proper analysis.[1] Accordingly, I turn to the arguments of the parties presented in this case.
III. SPIRIT’S ARGUMENT
The crux of Spirit’s complaint in this case is that in response to Spirit’s entry into the two relevant geographic markets, Detroit to Boston (“DTW-BOS”) and Detroit to Philadelphia (“DTW-PHL”), Northwest dropped its fares below its average variable cost and added capacity to drive Spirit out of the two markets. Moreover, Spirit alleges that shortly after it was forced out of the two markets, Northwest raised its fares to pre-predation levels to recoup its sacrificed profits. In support of its claim, Spirit presented expert reports from three notable economists, Professor Kenneth G. Eizinga, Dr. Daniel P. Kaplan, and Professor David E. Mills.
In his report, Professor Eizinga explained that the relevant market in which to evaluate Northwest’s predation is that in which Spirit competed — namely, point- *956 to-point travel on the two relevant geographic routes (hereafter “local” passengers). Thus, Professor Elzinga argues that Northwest’s revenue generated from connecting passengers (passengers with destinations other than the origination and destination cities) should not be included in the analysis. Moreover, Spirit’s strategy was directed only towards price-sensitive leisure travelers, because it offered only one to two flights a day, sold its tickets on a non-refundable basis, and did not offer first-class service, a frequent-flyer program, or onboard meals. Thus, Professor Elzinga argues that because Spirit did not compete with Northwest for local price-insensitive business travelers, those revenues should be excluded from any predation analysis as well. Instead, Professor Elzinga contends that the relevant market at issue should be limited to Northwest’s actions in the local, price-sensitive passenger market.
Relying on Professor Elzinga’s analysis of the relevant market, Dr. Kaplan evaluated the actual fares offered by Northwest in both the local market and the more specific, local, price-sensitive market. Dr. Kaplan then measured those fares against the average variable cost based on all passengers (including connecting passengers and price-insensitive passengers). Dr. Kaplan’s rationale for using the average variable cost as determined by all passengers flown is that passenger-variable costs such as processing the ticket or beverage service do not vary materially between connecting and local passengers or price-sensitive and price-insensitive passengers. Moreover, by including all passengers flown, the average variable cost is lower than if the value was calculated just based on local price-sensitive passengers. Comparing Northwest’s fares to the average variable cost, Dr. Kaplan concludes that both in the local market as a whole as well as the sub-market of price-sensitive passengers, Northwest charged fares below its average variable cost.
The last of Spirit’s three expert witnesses, Professor Mills, argues that given the structure of the market at Detroit Metropolitan Wayne County Airport (“DTW”), Northwest could be reasonably assured of recouping profits it sacrificed during the predation period. Specifically, Professor Mills argues that because of its dominance at DTW and the scarcity of available gates for new entrants, Northwest could reasonably have expected not to face another entrant following Spirit’s exit from the market. Accordingly, Professor Mills concludes that Northwest could have been reasonably confident that it could return to pre-predation prices to recoup profits sacrificed during predation. Having summarized Spirit’s argument, I now turn to Northwest’s response.
IV. NORTHWEST’S RESPONSE
Northwest’s response to Spirit’s experts is contained in the report of its own expert, Dr. Januz Ordover. Dr. Ordover challenges each of the premises of the arguments of Spirit’s three experts. First, Dr. Ordover argues that Professor Elzinga improperly concluded that the relevant market at issue is something other than the total-passenger market on the two relevant geographic routes. Second, Dr. Ordover challenges Dr. Kaplan’s price-cost analysis by arguing that it was error to compare a subset of passenger revenue with the average variable cost calculated for all passengers. Finally, Dr. Ordover claims that Dr. Mills’s recoupment analysis is flawed because it relies on several incorrect assumptions. I will briefly touch on each of Dr. Ordover’s points.
With regard to Professor Elzinga’s definition of the relevant market, Dr. Ordover argues that it is simply contrived to view *957 the sub-segments of passengers which travel on the two relevant routes as separate markets. Dr. Ordover states that “[a]t the route level, this means that the airline must cover the costs of its operations on the route, and that at least on some of the routes in the system it must earn enough contribution in excess of the route-specific costs to cover the remaining costs of operating the airline.” Joint Appendix (“J.A.”) at 604 (Ordover Rebuttal Report at 9). Thus, Dr. Ordover concludes “[e]very airline attempts to cover these costs by striving to earn net contribution from all types of passengers on the route, not just the ones segmented out by the Plaintiff’s experts.” Id. Therefore, he argues that it is the mixture of fares from business travelers, leisure travelers, and connecting passengers, which the airline attempts to optimize to ensure profitability on each route.[2] For example, Dr. Ordover would argue that a below-cost leisure fare may be offset by a significantly higher above-cost business fare, but so long as the mix of revenue ensures profitability, the airline is behaving rationally.
With regard to Dr. Kaplan’s price-cost analysis, Dr. Ordover faults Dr. Kaplan’s comparison of local, price-sensitive fares to the average variable cost for all passengers. Dr. Ordover argues that because the vast majority of variable costs are common costs, it is simply arbitrary to allocate them equally among all the passengers. Instead, he would argue that the higher-priced fares should be allocated a higher percentage of the common-variable costs, while the lower-priced fares, such as the local, price-sensitive fares, should be allocated less. For example, Dr. Ordover would claim that there is no inherent reason why a business fare of $120 and a local leisure fare of $60 should be allocated the same share of common-variable costs, such as the pilot’s salary. The effect of the uniform allocation of common-variable costs only serves to make one fare very profitable while the other is not. Instead, Dr. Ordover would argue that the appropriate way to measure costs for purposes of evaluating predatory pricing is to calculate the incremental average variable cost for the additional passengers generated by Northwest’s low-fare campaign. Specifically, he explains that by taking the passenger-variable costs for the incremental passengers Northwest gained as a result of its low-fare campaign plus the common-variable costs associated only with the additional capacity Northwest added to the two routes during the campaign, divided by the total incremental passengers gained, gives a true measure of the variable costs of Northwest’s pricing strategy. Dr. Ordover concludes by noting that the low fares which Northwest offered in re *958 sponse to Spirit were still above the incremental average variable cost for the additional passengers on both routes.
Finally, Dr. Ordover critiques Professor Mills’s recoupment analysis. Specifically, Dr. Ordover disputes several of Professor Mills’s assumptions upon which his analysis relies. A recoupment analysis determines whether it is plausible that the alleged predator would likely recover the profits it sacrificed during the predation period following the new entrant’s exit from the business. Inherent in the analysis is reliance upon a number of key assumptions, such as what profits Northwest would have earned if Spirit had not entered the market. Dr. Ordover disputes Professor Mills’s assumptions about what fares Northwest would have charged absent Spirit’s entry. Dr. Ordover also argues that Northwest did not expect that by simply matching Spirit’s fares, Spirit would be forced out of the market. Finally, he explains that the barriers to entry at DTW were not sufficiently high as to prevent another competitor from entering the market once Spirit exited. Therefore, he argues Northwest could not reasonably expect to recoup any monopolist profits.
Y. LEGAL ANALYSIS
Having studied the expert reports submitted in this case, I believe both sides have presented credible opinions, which are supported by evidence presented in the record. Specifically, a reasonable trier of fact could find that Spirit’s experts have put forth a compelling argument that Northwest did engage in predatory pricing in the limited market in which Spirit competed that eventually forced Spirit out of the market. In addition, a reasonable trier of fact could conclude instead that the relevant market must be viewed as the route itself and that predation cannot be measured by just one type of fare. As we have stated, however, determination of the relevant product market is an issue for the jury to decide. See Lewis v. Philip Morris Inc., 355 F.3d 515, 533 (6th Cir.2004) (holding that the definition of the relevant product market “is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility”) (internal quotation omitted), cert. denied, 543 U.S. 821, 125 S.Ct. 61, 160 L.Ed.2d 31 (2004).
Moreover, even if the relevant market is found to be price-sensitive leisure passengers, disputes exist regarding whether Northwest priced its fares in that market below average variable cost and whether recoupment was a plausible strategy. Thus, a reasonable trier of fact could find either that Dr. Kaplan demonstrated that Northwest’s matching fares were below its average variable cost or instead could agree with Dr. Ordover’s opinion as to the correct formulation of variable costs. In addition, a reasonable trier of fact could find that Professor Mills had persuasively explained that recoupment was plausible or instead could adopt Dr. Ordover’s reasoning that the assumptions upon which Spirit relied were flawed.
In sum, because I find that both parties’ expert opinions were reasonable, supported by evidence in the record, and could each be found persuasive by a reasonable trier of fact, I conclude the district court erred in granting Northwest summary judgment in this case. Specifically, the district court erred in adopting Northwest’s expert analysis over the one presented by Spirit. Like the majority opinion, I believe that the parties’ “competing expert opinions present the ‘classic battle of the experts’ and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves.” Phillips v. Cohen, 400 F.3d 388, 399 (6th Cir.2005) (internal quotation omitted) (alteration in *959 original). At the summary judgment stage of a case, the district court should not weigh the evidence or judge the credibility of witnesses. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that “[cjredibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment”). Accordingly, I concur with my colleagues that the decision of the district court should be reversed and the case should be remanded for further proceedings.

. As I discuss infra, despite Northwest's argument to the contrary, our opinion in Directory Sales Management Corp. v. Ohio Bell Telephone Co., 833 F.2d 606 (6th Cir. 1987), does not stand for the proposition that we must evaluate Northwest's practices on a route-wide basis rather than a more segmented fare-specific analysis.

. Northwest argues in its brief that this issue has already been decided by Sixth Circuit precedent. Specifically, Northwest claims that our holding in Directory Sales Management, requires a court to look at an alleged predator’s "operations taken as a whole.” 833 F.2d at 614. I do not find this case to be on point. In Directory Sales, the two companies competed in the exact same market but the plaintiff attempted to isolate one portion within that market to demonstrate that the incumbent was predatorily pricing. Id. at 613. We held that the portion which the plaintiff identified was neither a separate product nor a separate market and that the plaintiff would need to show predatory pricing in the market as a whole. Id. at 614. Critical to our holding in that case was that the two companies’ businesses were coextensive. By contrast, in this case, Spirit's service is not coextensive with Northwest’s service. Spirit alleges that Northwest engaged in predatory pricing in the only market in which Spirit serves, i.e., local, price-sensitive passengers. If a reasonable trier of fact finds that such a distinct market exists, then Spirit has alleged a cognizable § 2 claim. Therefore, I conclude that our holding in Directory Sales does not apply.